**EM LTD., NML Capital, Ltd.,**
**Plaintiffs–Appellees,**

v.

**BANCO CENTRAL DE LA REPÚBLICA ARGENTINA, Republic of Argentina, Defendants–Appellants.**

Nos. 13–3819–cv (L), 13–3821–cv (CON).

United States Court of Appeals,
Second Circuit.

Argued: Dec. 10, 2014.

Decided: Aug. 31, 2015.

Joseph E. Neuhaus (Michael J. Ushkow and Zeh S. Ekono, Sullivan & Cromwell LLP, New York, N.Y.; Jeffrey B. Wall, Sullivan & Cromwell LLP, Washington, DC, on the brief), Sullivan & Cromwell LLP, New York, N.Y., for Banco Central de la República Argentina, Defendant–Appellant.

Carmine D. Boccuzzi, Jr. (Jonathan I. Blackman, Daniel J. Northrop, and Michael M. Brennan, on the brief), Cleary Gottlieb Steen & Hamilton LLP, New York, N.Y., for Republic of Argentina, Defendant–Appellant.

Theodore B. Olson (Matthew D. McGill and Jason J. Mendro, Gibson, Dunn & Crutcher LLP, Washington, DC; Robert A. Cohen and Dennis H. Hranitzky, Dechert LLP, New York, N.Y., on the brief), Gibson, Dunn & Crutcher LLP, Washington, DC, for NML Capital, Ltd., Plaintiff–Appellee.

David W. Rivkin, Debevoise & Plimpton LLP, New York, N.Y., for EM Ltd., Plaintiff–Appellee.

Before: CABRANES, WESLEY, and HALL, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

In December 2001, in the midst of a severe financial crisis, the Republic of Argentina ("Argentina" or "the Republic") declared a moratorium on principal and interest payments for more than $80 billion in sovereign debt, including bonds that were issued under a Fiscal Agency Agreement ("FAA"). Pursuant to two "exchange offers" in 2005 and 2010, Argentina "restructured" over 91% of the then-existing FAA bonds.[1]

---

[1] "Debt restructuring" is a process that allows corporations and sovereign nations facing financial distress to reduce and renegotiate their debts. *See* David L. Scott, *Wall Street Words: An A to Z Guide to Investment Terms for Today's Investor* 97 (3d ed.2003) ("Creditors having difficulty making interest and/or principal payments often restructure their debt to reduce the size of the interest payments and to extend debt maturity."). We previously described Argentina's restructuring as follows:

In 2005, Argentina initiated an exchange offer in which it allowed FAA bondholders

Plaintiffs-appellees EM Ltd. ("EM") and NML Capital, Ltd. ("NML") (jointly, "plaintiffs") own FAA bonds that were *not* restructured. Since 2001, Argentina has refused to make any scheduled payments on these defaulted bonds. In 2003, plaintiffs filed suit in the United States District Court for the Southern District of New York, seeking to recover their unpaid principal and interest. Plaintiffs eventually obtained judgments against Argentina, which now total approximately $2.4 billion.

This appeal concerns plaintiffs' ongoing efforts to satisfy their judgments against Argentina by attaching funds held by Argentina's central banking authority, the Banco Central de la República Argentina ("BCRA"). In their third amended complaint ("TAC"), plaintiffs seek a declaratory judgment that BCRA is Argentina's "alter ego" and that, therefore, BCRA is liable for Argentina's debts. If successful, plaintiffs' stated intent is to use the declaratory judgment to attach unspecified funds that BCRA holds in unnamed foreign jurisdictions.

As an instrumentality of a sovereign state, BCRA is ordinarily immune from lawsuits in American courts under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602 *et seq.* ("FSIA").[2] Accordingly, BCRA moved to dismiss the TAC for lack of subject matter jurisdiction on sovereign-immunity grounds, as well as for lack of personal jurisdiction and for failure to state a claim upon which relief can be granted. On September 26, 2013, the United States District Court for the Southern District of New York (Thomas P. Griesa, *Judge*) issued an order denying BCRA's motion.

Relevant to this appeal, the District Court concluded that BCRA had waived its sovereign immunity under two statutory exceptions. First, the District Court held that the FAA's express waiver of sovereign immunity also waived BCRA's immunity—under 28 U.S.C. § 1605(a)(1)[3]—because BCRA is Argentina's "alter ego." Second, the District Court held that BCRA's use of its account with the Federal Reserve Bank of New York ("FRBNY") constituted "commercial activity" in the United States, which waived BCRA's sovereign immunity under 28 U.S.C. § 1605(a)(2).[4]

Because neither of these statutory exceptions applies to this case, the District

---

to exchange their defaulted bonds for new unsecured and unsubordinated external debt at a rate of 25 to 29 cents on the dollar. In exchange for the new debt, participants agreed to forgo various rights and remedies previously available under the FAA.

. . . .

In 2010, Argentina initiated a second exchange offer with a payment scheme substantially identical to the 2005 offer. *NML Capital, Ltd. v. Republic of Argentina,* 699 F.3d 246, 252 (2d Cir.2012).

**2.** 28 U.S.C. § 1603 provides, in pertinent part, the following:

(a) A "foreign state" . . . includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity—
(1) which is a separate legal person, corporate or otherwise, and
(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof. . . .

**3.** 28 U.S.C. § 1605(a)(1) states in relevant part that a foreign state shall not be immune from jurisdiction if it "has waived its immunity either explicitly or by implication."

**4.** 28 U.S.C. § 1605(a)(2) states in relevant part that a foreign state is not immune from any action "based upon a commercial activity carried on in the United States."

Court erred in denying BCRA's motion to dismiss for lack of subject matter jurisdiction. Accordingly, we **REVERSE** the District Court's order of September 26, 2013, and we **REMAND** the cause with instructions to dismiss the TAC with prejudice.

## BACKGROUND

### I. The Underlying Debt

In 1994, Argentina began issuing debt securities pursuant to a Fiscal Agency Agreement ("FAA bonds"). In light of Argentina's "history of defaulting on, or requiring restructuring of, its sovereign obligations,"[5] investors demanded that the FAA include a waiver of Argentina's foreign sovereign immunity as to "any suit, action, or proceeding against it or its properties, assets or revenues with respect to the" FAA bonds, and any suit brought "for the purpose of enforcing or executing" a judgment obtained in a related proceeding.[6] Argentina agreed to include this waiver of sovereign immunity in the FAA.[7]

In December 2001, Argentina declared a moratorium on principal and interest payments on more than $80 billion of foreign debt, including the FAA bonds.[8] Since then, Argentina has not made principal or interest payments on these bonds. In

2005 and 2010, Argentina successfully restructured over 91% of its debt by launching "global exchange offers," pursuant to which creditors holding the defaulted bonds could exchange them for new securities with modified terms that substantially reduced their value.[9] Plaintiffs EM and NML own FAA bonds that were *not* restructured.

Beginning in 2003, plaintiffs filed multiple actions against Argentina in the Southern District of New York in an effort to recover the full amounts due on their defaulted bonds. Argentina did not dispute that *its* sovereign immunity had been waived in the FAA. Plaintiffs eventually obtained numerous final judgments against Argentina, which now total approximately $2.4 billion.[10] These judgments remain unpaid.

### II. Litigation Against BCRA

On December 15, 2005, Argentina's President, Néstor Kirchner, issued two emergency executive decrees—Decree 1599/2005 and Decree 1601/2005 (jointly, the "Decrees")—both of which involved funds held by BCRA.[11] The first decree provided that reserves held by BCRA in excess of the amount needed to support Argentina's monetary base[12] could "be

---

5. *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 466 n. 2 (2d Cir.2007) (*"BCRA I"*); *see also id.* (recording Argentina's "many contributions to the law of foreign insolvency through its numerous defaults on its sovereign obligations,. as well as through ... a diplomacy of default").

6. J.A. at 329–30, 343–44.

7. Argentina "concedes that in the [FAA] governing the debt instruments owned by plaintiffs it clearly and unambiguously waived its right to assert its sovereign immunity from suit in claims regarding those instruments." *NML Capital, Ltd. v. Banco Central de la República Argentina*, 652 F.3d 172, 176 n. 3 (2d Cir.2011) (*"BCRA II"*).

8. *See id.* at 175.

9. *Id.* at 176 & n. 4.

10. *Id.* at 176 & n. 6.

11. Reproductions of Decree 1599/2005 and Decree 1601/2005—in Spanish and English translation—are provided in the J.A. at 579–88.

12. *See BCRA I*, 473 F.3d at 468 (defining "monetary base" as being "composed of the monetary circulation of Argentine pesos plus the demand deposits of the financial entities with BCRA, in checking accounts or special accounts") (citing Law No. 23,928 of 3/27/91

used for payment of obligations undertaken with international monetary authorities."[13] The decree labeled these excess reserves "unrestricted reserves." The second decree directed the Ministry of Economy and Production to take the necessary steps to repay Argentina's debt to the International Monetary Fund ("IMF") out of the unrestricted reserves. As we previously noted:

At the time of the Decrees, BCRA had approximately $26.8 billion in reserves and needed $18.4 billion to cover the monetary base; thus, approximately $8.4 billion in reserves became Unrestricted Reserves pursuant to the Decrees. On December 29, 2005, the Ministry issued Resolution No. 49, directing BCRA to repay [Argentina's] debt to the IMF and providing that, in exchange, [Argentina] would give BCRA a non-transferrable note.[14]

Soon after these Decrees were issued, plaintiffs made their first attempt to satisfy their judgments against Argentina by attaching funds held by BCRA. On December 30, 2005, plaintiffs moved in the Southern District of New York for an *ex parte* order to restrain funds held by BCRA. Plaintiffs asserted that the Decrees had the effect of transferring ownership of certain BCRA assets—including funds held in BCRA's account with the FRBNY—from BCRA to Argentina. The District Court entered temporary restraining orders with respect to, *inter alia,* the property held by BCRA in eight garnishee banking institutions, including the FRBNY.[15]

On January 12, 2006, the District Court vacated the temporary restraining orders.[16] Plaintiffs appealed the District Court's decision, maintaining that the Decrees amounted to an expropriation by Argentina of BCRA's assets in order to pay Argentina's debt to the IMF, and that, consequently, the funds in BCRA's FRBNY account had become Argentina's property.

On January 5, 2007, we rejected plaintiffs' argument and affirmed the District Court's order, holding that "the Decrees did not alter property rights with respect to the FRBNY Funds" because they "did not create an attachable interest on the part of [Argentina] in the FRBNY Funds."[17] Although we thus rejected plaintiffs' transfer-of-ownership argument, we noted the difference between two theories of attachment—(1) that "the Decrees transferred to the Republic ownership or control over *the assets* of BCRA"; and (2) that Argentina controlled "*BCRA itself*"— *i.e.,* that BCRA was Argentina's alter ego.[18] We concluded that plaintiffs had not established that BCRA's funds were *transferred* to Argentina, but we noted that plaintiffs' allegations regarding Argentina's "misdeeds ... might have lent some credence to" the alter-ego theory.[19]

art. 6, *as amended by* Law No. 25,561 of 1/7/02 art. 4) (internal quotation marks and brackets omitted).

13. *Id.* at 468 (quoting Decree 1599/2005 art. 1, J.A. at 581).

14. *Id.*

15. *Id.* at 469. On January 3, 2006, the BCRA paid Argentina's debt to the IMF out of the BCRA's funds. The FRBNY funds that were subject to the restraining notices were not used in connection with that payment, although the parties disputed "whether the funds might have been used for this purpose in the absence of the court-ordered restraints on the transfer of the funds." *Id.*

16. *Id.* at 470.

17. *Id.* at 472.

18. *Id.* at 475 (emphasis in the original).

19. *Id.* at 480.

That is, we suggested that plaintiffs could potentially argue that BCRA was "so extensively controlled by [Argentina] that a relationship of principal and agent is created," or that recognizing BCRA's separate juridical status would "work fraud or injustice"[20]—and that, if successful, this claim would subject *all* of BCRA's assets to potential attachment by Argentina's judgment creditors.

In September 2006, while *BCRA I* was pending, plaintiffs commenced a new action seeking a declaratory judgment that, pursuant to *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) ("*Bancec*"), BCRA was liable for Argentina's debts. Specifically, plaintiffs argued that Argentina's consistent disregard for BCRA's independence had vitiated any presumption of separateness to which BCRA was entitled, transforming BCRA into Argentina's "alter ego."

In this new action, plaintiffs also pursued attachment orders against BCRA's FRBNY funds based on this alter-ego theory. On April 7, 2010, the District Court granted plaintiffs' attachment motions and ruled that, at the time of BCRA's repayment of Argentina's debt to the IMF (December 2005), BCRA was Argentina's alter ego.[21] The District Court also concluded that the attachment of BCRA's FRBNY funds did not violate § 1611(b)(1), which immunizes "property ... of a foreign central bank ... held for its own account."

Accordingly, the District Court authorized the attachment of the $105 million deposited in BCRA's FRBNY account.

This order was appealed and in 2011, in *BCRA II*, we vacated the attachment on the sole ground that the funds held in BCRA's FRBNY account were "immune" from execution under § 1611(b)(1).[22] We declined to reach the District Court's alter-ego determination and instead concluded that these funds were immune from attachment "without regard to whether the [BCRA] is independent from its parent state pursuant to *Bancec*."[23] We thus intimated no view as to "whether the District Court correctly determined that [Argentina's] control of BCRA was sufficient to disregard the presumption of juridical separateness under *Bancec*."[24] Accordingly, we vacated the District Court's attachment orders with respect to the FRBNY funds and remanded the cause to the District Court for further proceedings.

### III. This Case Upon Remand

On remand, plaintiffs filed the TAC—the operative complaint for purposes of this appeal.[25] Pursuant to our ruling in *BCRA II*, funds held in BCRA's accounts with the FRBNY are immune from attachment. Accordingly, the TAC is framed more broadly—the declaratory judgment it seeks would establish: (1) that BCRA is the alter ego of Argentina; and (2) that BCRA is thus liable for any and all of Argentina's debts.[26] Plaintiffs' stated pur-

---

**20.** *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 629, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) ("*Bancec*") (internal quotation marks omitted) (applying corporate-law principles to determine circumstances under which separate juridical status of government instrumentality must be disregarded).

**21.** *See EM Ltd. v. Republic of Argentina*, 720 F.Supp.2d 273, 302–04 (S.D.N.Y.2010).

**22.** *See BCRA II*, 652 F.3d at 186–87.

**23.** *Id.* at 187–88.

**24.** *Id.* at 196 n. 24.

**25.** *See* J.A. at 3026–83 (filed August 31, 2012).

**26.** J.A. at 3027 (TAC ¶ 1).

pose for seeking this judgment is to enable them to attach *any* asset held by BCRA *anywhere* in the world in satisfaction of their judgments against Argentina.[27] This option was arguably left open by *BCRA II*, which foreclosed the possibility of attaching assets deposited in BCRA's own accounts in the United States, but did not otherwise address plaintiffs' ability to reach BCRA assets elsewhere.

In November 2012, Argentina and BCRA moved to dismiss the TAC for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim. Oral argument on this motion was held at a conference of the District Court on September 25, 2013. Plaintiffs argued that BCRA had waived its sovereign immunity on two grounds. First, plaintiffs asserted a theory of implied waiver—that is, because BCRA is the alter ego of Argentina, Argentina's express waiver of immunity in the FAA should be imputed to BCRA.[28] Second, plaintiffs asserted that BCRA waived its immunity by engaging in "commercial activity" in New York through its FRBNY account.[29]

In denying the motion to dismiss, the District Court explicitly adopted plaintiffs' arguments for jurisdiction. In its bench order, the District Court stated:

What I'm going to do this afternoon is to deny the motions to dismiss the [TAC]. I believe there is jurisdiction in the way [plaintiffs' counsel] Mr. Cohen describes jurisdiction which makes it appropriate to entertain the action; and considering the provisions of the Foreign Sovereign Immunities Act, I believe that there is

an implied waiver here and I believe there's commercial activity so that the provisions of 28 U.S.C. 1605(a)(1) and (a)(2) are applicable.

This really is, denying a motion to dismiss, exactly what would emerge from a litigation that has problems. The plaintiffs' position has problems, as I've indicated. But I think those problems do not require the dismissal of the action. And I want to repeat something which I'm sure I've said maybe more than once this afternoon; and that is, we don't have a republic which is acting in a normal way as far as its debts. We don't have a situation [where] there is a completely regular dealing between the [R]epublic and BCRA the way that I'm sure would exist with the Bank of England or the Central Bank of Germany or France or certainly with the Federal Reserve Bank. We don't have that. We have irregularities.

The reason that I believe the action should be held open is I think there is a very legitimate claim by the plaintiffs here that for certain purposes BCRA is the alter ego of the [R]epublic.

In the papers before me, the plaintiffs have made a very powerful case of that, and I so held in my earlier decision, and that holding was not what was disturbed by the Court of Appeals. So, there's a very good case of alter ego.

I believe that the Court should entertain the idea that it would be desirable to have this Court with its experience in this case and its background in this case make some kind of formal ruling of alter

27. *See* Special App. ("SPA") at 4 (9/25/13 Tr. 3:21–23) ("We would like to be able to have a judgment that holds BCRA liable for the judgments entered against Argentina that we may enforce as a judgment if we find assets anywhere."); *id.* at 10–13 (9/25/13 Tr. 9:10–12:15) (arguing that plaintiffs could take the

declaratory judgment to California, Switzerland, or Germany and use it to attach BCRA's assets held in those jurisdictions).

28. *See id.* at 27–28 (9/25/13 Tr. 26:24–27:1).

29. *See id.* at 29–31 (9/25/13 Tr. 28:1–30:2).

ego which could be legitimately used in a proceeding in another state or a foreign country so that the plaintiffs do not have to go to the other state or the foreign country and start in again, once again, and maybe more than once again with this presentation about alter ego.

The motion to dismiss the action is denied.[30]

This appeal followed.[31]

## DISCUSSION

### I. Appellate Jurisdiction

■ In general, our appellate jurisdiction is limited to "final decisions" of district courts;[32] the District Court's order here is interlocutory. BCRA asserts, however, that we have jurisdiction under the "collateral order" exception to review BCRA's claim of sovereign immunity as a defense to subject matter jurisdiction.[33]

■ Under this exception, an interlocutory appeal is available for "a small class of 'collateral' rulings that do not terminate

the litigation in the court below but are nonetheless sufficiently 'final' and distinct from the merits to be appealable without waiting for a final judgment to be entered."[34] To fit within the exception, the interlocutory order must: (1) "conclusively determine the disputed question," (2) "resolve an important issue completely separate from the merits of the action," and (3) "be effectively unreviewable on appeal from a final judgment."[35]

A denial of foreign sovereign immunity generally satisfies the conditions necessary to invoke the collateral order doctrine.[36] For instance, in *Rein v. Socialist People's Libyan Arab Jamahiriya*,[37] we held that all three prongs of the above test were satisfied because: (1) the district court's ruling on sovereign immunity conclusively determined the issue of subject matter jurisdiction; (2) the issue of jurisdiction is separate from the merits; and (3) an appeal from final judgment cannot repair the damage caused to a sovereign that is improperly required to litigate a case.[38]

---

**30.** *Id.* at 32–34 (9/25/13 Tr. 31:19–33:7).

**31.** The TAC names both BCRA and the Republic of Argentina as defendants in this lawsuit, and both BCRA and the Republic have appealed the District Court's denial of their joint motion to dismiss the TAC.

**32.** 28 U.S.C. § 1291.

**33.** *See MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n*, 471 F.3d 377, 383 (2d Cir.2006).

**34.** *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 146 (2d Cir.2013) (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)).

**35.** *Whiting v. Lacara*, 187 F.3d 317, 320 (2d Cir.1999) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978)) (internal quotation marks omitted).

**36.** *See Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 80 (2d Cir.2013) (col-

lecting cases); *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir.2007); *see also Gupta v. Thai Airways Int'l, Ltd.*, 487 F.3d 759, 763 n. 6 (9th Cir.2007) ("[E]ach of our sister circuits that has considered whether a denial of a motion to dismiss on grounds of foreign sovereign immunity is an appealable collateral order ha[s] unanimously held that it is.") (collecting cases).

**37.** 162 F.3d 748, 755–56 (2d Cir.1998).

**38.** *See id.* ("A sovereign that is required to litigate a case on the merits before it can appeal the assertion of jurisdiction over it has not been afforded the benefit of the immunity to which it is entitled."); *Foremost–McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C.Cir.1990) ("[S]overeign immunity is an immunity from trial and the attendant burdens of litigation[.]") (internal quotation marks omitted); *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 145–46, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (same in the context of state sovereign immunity under the Eleventh Amendment).

Notwithstanding the collateral-order doctrine, plaintiffs assert that we lack appellate jurisdiction here because the "immunity question cannot be decided without addressing [plaintiffs'] underlying claims on the merits." [39] According to plaintiffs, BCRA's alter-ego status is a predicate to holding that the FAA's sovereign-immunity waiver binds BCRA and, therefore, resolving the immunity issue now would require an unnecessary and burdensome inquiry into the extent of Argentina's control over BCRA. Accordingly, plaintiffs urge us to defer review until the District Court issues a final judgment.[40]

■ These arguments are unpersuasive. We have consistently held that the threshold sovereign-immunity determination is immediately reviewable under the collateral-order doctrine.[41] In fact, this case is similar to *U.S. Fidelity & Guaranty Co. v. Braspetro Oil Sérvices Co.*,[42] in which we also reviewed the denial of a motion to dismiss brought by a purported foreign-state alter ego, and in which we held that a court reviewing a district court's sovereign-immunity decision must assess whether plaintiffs "have made a sufficient showing [of alter ego] *at this point in the litigation.*" [43] As the Supreme Court has held, "a question of immunity is separate from the merits of the underlying action . . . even though a reviewing court must consider the plaintiff's factual allegations in resolving the immunity issue." [44]

At this stage in the case, we must (1) assume the truth of the TAC's factual allegations, and then (2) assess whether these allegations are sufficient to establish that BCRA waived its sovereign immunity. If we are able to determine conclusively that the pleadings do not establish, as a matter of law, that BCRA waived its sovereign immunity, it would be inconsistent with the underlying purpose of the foreign-sovereign-immunity doctrine to subject BCRA to further burdensome litigation.[45]

**39.** Plaintiffs–Appellees Br. at 21 (quoting *Grp. Health Inc. v. Blue Cross Ass'n*, 793 F.2d 491, 497 (2d Cir.1986)).

**40.** In so arguing, plaintiffs principally rely on two cases from this Circuit, neither of which concerned motions to dismiss based on *sovereign immunity*. In *White v. Frank*, 855 F.2d 956 (2d Cir.1988), we denied interlocutory review of a failed absolute-immunity defense, because immunity turned on whether defendants were liable for the constitutional tort of malicious prosecution. In *Grp. Health Inc. v. Blue Cross Ass'n*, 793 F.2d 491 (2d Cir.1986), we similarly denied appellate review where absolute immunity turned on whether the defendant acted within the scope of its authority.

**41.** *See ante* note 36.

**42.** 199 F.3d 94 (2d Cir.1999).

**43.** *Id.* at 98 (emphasis supplied).

**44.** *Mitchell v. Forsyth*, 472 U.S. 511, 528–29, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *see also Johnson v. Jones*, 515 U.S. 304, 314, 115

S.Ct. 2151, 132 L.Ed.2d 238 (1995) (a claim of immunity is immediately appealable even though it is "sometimes practically intertwined with the merits"); *cf. Ashcroft v. Iqbal*, 556 U.S. 662, 672–75, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (jurisdiction proper over qualified immunity appeal concerning legal sufficiency of pleadings because "[e]valuating the sufficiency of a complaint is not a 'fact based' question of law"); *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 760–61 (2d Cir.2003) (existence of qualified immunity under plaintiffs' version of the facts "turns on an issue of law" and is thus immediately appealable).

**45.** *See Republic of Philippines v. Pimentel*, 553 U.S. 851, 865, 128 S.Ct. 2180, 171 L.Ed.2d 131 (2008) (the foreign-sovereign-immunity doctrine "is designed to 'give foreign states and their instrumentalities some protection from the inconvenience of suit.'" (quoting *Dole Food Co. v. Patrickson*, 538 U.S. 468, 479, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003))).

Accordingly, we conclude that we have jurisdiction under the collateral-order doctrine to review the District Court's threshold determination that BCRA waived its sovereign immunity pursuant to 28 U.S.C. § 1605(a)(1) (the express waiver exception) and 28 U.S.C. § 1605(a)(2) (the commercial activity exception).[46]

## II. Sovereign Immunity

Moving to the merits of this appeal, the sole issue we consider is whether the District Court erred in its conclusion that BCRA waived its sovereign immunity. We review this conclusion *de novo.*[47]

There is no dispute that BCRA is an instrumentality of Argentina and that, unless one of the FSIA's exceptions applies, BCRA is entitled to invoke its sovereign immunity as a defense to this lawsuit.[48] Here, the District Court concluded that two exceptions applied. First, it held that the FAA's express waiver of sovereign immunity under § 1605(a)(1) is imputable to BCRA (as Argentina's "alter ego"). Second, it held that BCRA's use of its account at the FRBNY constituted "commercial activity" in the United States within the meaning of § 1605(a)(2).

We address each exception in turn.

### A. Alter Ego

#### 1. Legal Standards

The controlling case for when an instrumentality of a sovereign state becomes the "alter ego" of that state is *First National City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983)—known as *Bancec.* In *Bancec,* the Supreme Court created a presumption that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such."[49] According to the Court,

[f]reely ignoring the separate status of government instrumentalities would result in substantial uncertainty over whether an instrumentality's assets would be diverted to satisfy a claim against the sovereign, and might thereby cause third parties to hesitate before

46. Because we conclude that the TAC fails to establish that BCRA waived its sovereign immunity, *see post* Section II, we need not and do not reach the issue of whether we have appellate jurisdiction (or pendent appellate jurisdiction) over BCRA's *other* asserted grounds for dismissal, which the District Court also rejected. These grounds include: (1) that plaintiffs lack Article III standing, because it is speculative whether the declaratory judgment sought by plaintiffs would redress their injury (*i.e.,* permit them to recover funds in other jurisdictions); and (2) that the TAC fails to state a plausible claim that BCRA is Argentina's alter ego. As to the first ground, we take no position on whether a declaratory judgment of the type sought here would satisfy the requirements of Article III. As to the second ground, plaintiffs' Rule 12(b)(6) argument overlaps substantially with our discussion of sovereign immunity, but we decline to exercise pendent appellate jurisdiction to review the District Court's denial of

plaintiffs' 12(b)(6) motion. Rather, as we explain in detail below, the TAC is to be dismissed solely on sovereign-immunity grounds.

47. *See Aurelius Capital Partners, LP v. Republic of Argentina,* 584 F.3d 120, 129 (2d Cir. 2009) ("We review *de novo* legal conclusions denying [FSIA] immunity to a foreign state or its property.").

48. *See Verlinden B.V. v. Cent. Bank of Nigeria,* 461 U.S. 480, 485 n. 5, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) ("[I]f none of the exceptions to sovereign immunity set forth in the [FSIA] applies, the District Court lacks both statutory subject matter jurisdiction and personal jurisdiction. The District Court's conclusion that none of the exceptions to the Act applied therefore signified an absence of both competence and personal jurisdiction.").

49. *Bancec,* 462 U.S. at 626–27, 103 S.Ct. 2591.

extending credit to a government instrumentality without the government's guarantee. As a result, the efforts of sovereign nations to structure their governmental activities in a manner deemed necessary to promote economic development and efficient administration would surely be frustrated.[50]

The Supreme Court drew support for this proposition in the legislative history of 28 U.S.C. § 1610(b),[51] the provision of the FSIA addressing the circumstances in which a judgment creditor may execute upon the assets of a foreign government's instrumentality:

> Section 1610(b) [of the FSIA] will not permit execution against the property of one agency or instrumentality to satisfy a judgment against another, unrelated agency or instrumentality. There are compelling reasons for this. If U.S. law did not respect the separate juridical identities of different agencies or instrumentalities, it might encourage foreign jurisdictions to disregard the juridical divisions between different U.S. [public] corporations or between a U.S. [public]

corporation and its independent subsidiary. However, a court might find that property held by one agency is really the property of another.[52]

Therefore, *Bancec* recognizes a statutory "presumption that a foreign government's determination that its instrumentality is to be accorded separate legal status" will be honored.[53] But this presumption of separateness may be rebutted by evidence establishing an alter-ego relationship between the instrumentality and the sovereign state that created it. Specifically, the presumption may be overcome and an alter-ego relationship established if: (1) the instrumentality "is so extensively controlled by its owner that a relationship of principal and agent is created"; or (2) the recognition of an instrumentality's separate legal status would work a "fraud or injustice."[54] As we previously noted, "both *Bancec* and the FSIA legislative history caution against too easily overcoming the presumption of separateness."[55]

## 2. Analysis

▪ Under *Bancec*, we are thus required to presume that BCRA is legally

---

**50.** *Id.* at 626, 103 S.Ct. 2591 (footnote omitted).

**51.** 28 U.S.C. § 1610(b) reads, in pertinent part, as follows:
> (b) . . . any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—
> (1) the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver. . . .

**52.** *Bancec*, 462 U.S. at 627–28, 103 S.Ct. 2591 (quoting H.R.Rep. No. 94–1487, at 29–

30 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6628–29).

**53.** *Id.* at 628, 103 S.Ct. 2591.

**54.** *Id.* at 629, 103 S.Ct. 2591 (internal quotation marks omitted); *see Letelier v. Republic of Chile*, 748 F.2d 790, 794 (2d Cir.1984) ("[A] foreign state instrumentality is answerable just as its sovereign parent would be if the foreign state has abused the corporate form, or where recognizing the instrumentality's separate status works a fraud or an injustice.").

**55.** *Letelier*, 748 F.2d at 795; *see also Seijas v. Republic of Argentina*, 502 Fed.Appx. 19, 22 (2d Cir.2012) (non-precedential summary order) (*Bancec* sets forth a "strong presumption" that an instrumentality has a "separate legal identity").

separate and distinct from Argentina. This presumption is overcome only if the TAC alleges facts sufficient to establish that either: (1) Argentina so extensively controlled BCRA that a relationship of principal and agent was created; or (2) recognizing BCRA as a separate entity would work a fraud or injustice.[56]

For the reasons that follow, neither prong of this test has been satisfied. Therefore, the presumption that BCRA is separate from Argentina has not been rebutted. Because Argentina's express waiver of sovereign immunity in the FAA does not apply to BCRA, plaintiffs' reliance on the § 1605(a)(1) exception necessarily fails.

### a. Extensive Control

■■■ We address first *Bancec's* "extensive control" prong. While measuring the level of control exercised over an instrumentality by a foreign sovereign is fact-intensive, courts have articulated several indicia to guide the inquiry.[57] Among the factors that have been deemed relevant are whether the sovereign nation: (1) uses the instrumentality's property as its own; (2) ignores the instrumentality's separate status or ordinary corporate formalities; (3) deprives the instrumentality of the independence from close political control that is generally enjoyed by government agencies; (4) requires the instrumentality to obtain approvals for ordinary business decisions from a political actor; and (5) issues policies or directives that cause the instrumentality to act directly on behalf of the sovereign state.[58] These factors are relevant to answering the touchstone inquiry for "extensive control": namely, whether the sovereign state exercises significant and repeated control over the instrumentality's day-to-day operations.[59]

---

**56.** The District Court did not clearly indicate which of these two theories it relied upon in making its alter-ego determination. It did, however, observe "that a general declaration of alter ego could ... have effects or implications beyond what [the Court] would intend," and that "the idea that BCRA is in a general way liable for the debts of the republic goes way too far." SPA at 31–32 (9/25/13 Tr. 30:19–21, 30:25–31:2). While the District Court ultimately concluded that plaintiffs have a legitimate claim that BCRA is the alter ego of Argentina for "certain purposes," *id.* at 33 (9/25/13 Tr. 32:17), it did not specify what those purposes were.

Our precedent supports the view, however, that once an instrumentality of a sovereign state has been deemed to be the alter ego of that state under *Bancec*, the instrumentality and the state are to be treated as one and the same for all purposes. *See Letelier*, 748 F.2d at 794 ("The *Bancec* Court held that a foreign state instrumentality is answerable *just as its sovereign parent would be* if the foreign state has abused the corporate form, or where recognizing the instrumentality's separate status works a fraud or an injustice." (emphasis supplied)). Because we conclude that the TAC fails to plead facts that would establish

that BCRA has become Argentina's alter ego for *any* purpose, we need not address the District Court's novel conclusion that an instrumentality may become an "alter ego" for just some, but not all, purposes.

**57.** For instance, the Fifth Circuit in *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416–18 (5th Cir.2006), listed 21 factors to consider to determine whether the foreign state "complete[ly] control[led]" the instrumentality. *See also Letelier*, 748 F.2d at 794.

**58.** *See, e.g., McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 352 (D.C.Cir.1995); *Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 178 (5th Cir.1989).

**59.** *See LNC Invs., Inc. v. Republic of Nicaragua*, 115 F.Supp.2d 358, 363 (S.D.N.Y.2000) (alter-ego test requires a showing that "the government exercises extensive control over the instrumentality's daily operations and abuses the corporate form"), *aff'd sub nom. LNC Invs., Inc. v. Banco Central de Nicaragua*, 228 F.3d 423 (2d Cir.2000) (affirming "for substantially the reasons stated by the district court"); *Seijas*, 502 Fed.Appx. at 22 (*Bancec* requires extensive control of subsidiary's

BCRA was founded in 1935 as Argentina's Central Bank.[60] By statute, it is "a self-administered institution," which is charged with acting as Argentina's agent and depository before international monetary, banking, and financial entities, as well as with regulating the Argentine banking system and financial sector.[61] BCRA's primary responsibility is to maintain the value of legal tender in Argentina—accordingly, it shall "exclusively issue banknotes and coins in the Argentine Nation," and "invest a portion of its external assets in deposits or other interest-bearing transactions with foreign banking institutions."[62] Moreover, BCRA is managed by an independent Board of Directors appointed by the "National Executive Power" with the consent of the national Senate.[63] BCRA has the authority to purchase and sell property, hold accounts, and sue and be sued in courts under its own name.[64]

Thus far, "on paper," BCRA appears to be a typical government instrumentality entitled to separate legal status.

However, plaintiffs argue, and the District Court presumably accepted, that BCRA's formal independence is belied by Argentina's extensive control over BCRA's day-to-day operations. Plaintiffs attempt to buttress this conclusion with three categories of factual allegations. Nonetheless, even if we assume the truth of all of them, these facts do not support a claim of "extensive control," because whatever control Argentina exerted was not tied to BCRA's *day-to-day* operations.

First, the TAC alleges that Argentina systematically eliminated BCRA's legal independence by: (1) permitting the President to appoint BCRA officers for an unspecified period without Senate approval; and (2) removing BCRA governors who supported the central bank's independence from the executive branch.[65] But courts have consistently rejected the argument that the appointment or removal of an instrumentality's officers or directors, standing alone, overcomes the *Bancec* presumption.[66] The hiring and firing of board

"day-to-day activities" or abuse of the corporate form.); *First Inv. Corp. of the Marshall Islands v. Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742, 753 (5th Cir.2012) ("[W]e look to the ownership and management structure of the instrumentality, paying particularly close attention to whether the government is involved in day-to-day operations, as well as the extent to which the agent holds itself out to be acting on behalf of the government." (internal quotation marks omitted)); *Doe v. Holy See*, 557 F.3d 1066, 1080 (9th Cir.2009) (*Bancec* requires allegations "of day-to-day control" in order "to overcome the presumption of separate juridical status").

60. *BCRA II*, 652 F.3d at 177 (citing Law No. 24,144/92, ch. I, § 1 (Oct. 22, 1992, as amended) ("BCRA Charter")). An English translation of the BCRA Charter is provided in the J.A. at 2786–2800.

61. BCRA Charter, arts. 1, 3–4 (J.A. at 2786–87); *see also id.* arts. 17–18, 21–22, 25 & 28–29 (J.A. at 2791–95).

62. *Id.* Arts. 30 & 33 (J.A. at 2795–96).

63. *See BCRA I*, 473 F.3d at 479 n. 15.

64. *Id.*

65. *See* J.A. at 3056–66 (TAC ¶¶ 76–96).

66. *See Transamerica Leasing, Inc. v. La República de Venezuela*, 200 F.3d 843, 849 (D.C.Cir.2000) ("If majority stock ownership and appointment of the directors were sufficient, then the presumption of separateness announced in *Bancec* would be an illusion."); *Foremost–McKesson*, 905 F.2d at 440 ("[M]ere involvement by the state in the affairs of an agency or instrumentality does not answer the question whether the agency or instrumentality is controlled by the state for purposes of FSIA."); *Hester Int'l Corp.*, 879 F.2d at 181 ("The two factors of 100% ownership and appointment of the Board of Directors cannot by themselves force a court to disregard the separateness of the juridical entities.").

members or officers is an exercise of power incidental to ownership, and ownership of an instrumentality by the parent state is not synonymous with control over the instrumentality's day-to-day operations. Governments commonly exercise some measure of control over their instrumentalities, much like parent corporations commonly control certain aspects of otherwise independent subsidiaries. Missing from plaintiffs' allegations are any claims that Argentina's appointment of board members then caused it to interfere in and dictate BCRA's daily business decisions. Ensuring that a board of directors of an instrumentality shares the sovereign's goals and policies for the instrumentality is not, by itself, extensive control. The sovereign must instead use its influence over these directors in order to interfere with the instrumentality's ordinary business affairs.

Second, the TAC alleges that Argentina issued executive decrees and legislative amendments to make it easier for the government to borrow from BCRA, and that Argentina subsequently borrowed tens of billions of dollars from BCRA in order to pay Argentina's debts to the IMF and other private creditors (but not to these plaintiffs).[67] However, as the United States argued before us as *amicus* in *BCRA II*,[68] the repayment by BCRA of Argentina's other debts does not establish the existence of an alter-ego relationship, because "central banks commonly perform payment functions for their governments, including central banks that are relatively independent from their governments."[69] Although the United States also argued that the IMF's status as a preferred creditor justified the payments,[70] that question goes to whether Argentina's choice to pay

67. *See* J.A. at 3036–56 (TAC ¶¶ 33–75) (BCRA's loans to Argentina between 2005 and 2010 included: (1) $8 billion to pay its debt to the IMF in 2005; (2) $6.7 billion to pay its debt to the Club of Paris in 2008; (3) $6.6 billion to pay its debt to private creditors in 2010; and (4) $17 billion from 2010 to 2012 to pay a variety of other debts). The "Club of Paris" is "an international organization established for the purpose of settling controversies concerning debts that were guaranteed or owed by LDC [Less Developed Country] governments to creditor governments." *BCRA I*, 473 F.3d at 466 n. 2 (internal quotation marks omitted) (alteration in the original).

68. In *BCRA II*, we did not reach the District Court's earlier holding that BCRA was Argentina's alter ego. However, the United States—which appeared as *amicus* in *BCRA II* in support of the position of BCRA—argued in the alternative that the District Court's analysis of the alter-ego issue in that earlier case was flawed. The *amicus* brief of the United States from *BCRA II* has been included in the record for this appeal. *See* J.A. at 3543–3573.

69. J.A. at 3569; *see also id.* at 3552 ("[T]he United States urges the Court to clarify that the BCRA's involvement in repaying the IMF

does not support disregarding the BCRA's separate juridical status.").

70. Specifically, the United States argued that Argentina's use of BCRA funds to repay the IMF did not justify ignoring BCRA's separate juridical status, because the

> decision to pay the IMF in preference to its other creditors was consistent with the long-standing policy of the United States and the other sovereign members of the IMF to recognize the preferred creditor status of the IMF. In order to protect the funds of its member states (including the funds invested by the United States), the IMF rightly expects to be paid even when other creditors are not. *See, e.g.,* International Monetary Fund, Financial Risk in the Fund and the Level of Precautionary Balances (Feb. 3, 2004) at 4 ("Member governments and other creditors have agreed to treat the Fund as a preferred creditor to help achieve its purposes. Preferred creditor status is fundamental to the Fund's financial responsibilities and the Fund's financing mechanism as this means that members give priority to repayment of their obligations to the Fund over other creditors thus protecting the reserve assets that other members have placed in the custody of the Fund.").

one set of creditors over another was legitimate—an inquiry that is unrelated to whether Argentina controlled BCRA in order to accomplish those payments.

Here, the Republic's plan to borrow money from BCRA was not executed by the Argentine government alone. Instead, the proposals received the necessary review and approval by BCRA's legal advisers and BCRA's Board of Directors,[71] and one BCRA Governor testified before Argentina's Congress that it made policy sense to permit the government to borrow funds from BCRA while its reserves earned relatively low interest.[72] Therefore, the Republic's decision to use BCRA to repay its debt to the IMF and other creditors is not indicative of the extensive control that concerned the Supreme Court in *Bancec.*[73]

Finally, the TAC alleges that Argentina and BCRA coordinated their activities in implementing an "inflationary" monetary policy.[74] However, governments and central banks—including the U.S. Government and the U.S. Federal Reserve—often consult and coordinate their actions with respect to monetary policy.[75] Whether the resulting policy is considered by some commentators as too "inflationary" or "deflationary" is irrelevant to the question of whether Argentina exercised day-to-day control over BCRA. It is not our role to second-guess monetary policy decisions made by foreign governments. We thus agree with the position of the United States in *BCRA II*—"central banks ordinarily have a high degree of interaction with their parent foreign governments," and as such, "courts should give significant deference to a foreign government's conduct vis-à-vis its central bank." [76] The alleged "coordination" of monetary-policy actions between Argentina and BCRA is simply not sufficient to establish "extensive control."

Considered cumulatively, these allegations certainly establish that the Republic sought the assistance of BCRA in responding to an extremely severe debt crisis, and that Argentina took steps to ensure that BCRA shared its policies and goals during this time. They do not establish, however, that the Republic so extensively controlled BCRA's day-to-day operations as to transform BCRA into the Republic's alter ego. Most of the actions allegedly taken by BCRA are governmental functions performed by most central banks—*i.e.*, paying a nation's creditors, controlling currency flows, and keeping foreign exchange deposits. Plaintiffs have not sufficiently alleged that these actions, or any others,

---

*Id.* at 3568–69. In fact, "[a]ccording to the IMF staff, many other countries had repaid the IMF out of international reserves held by the debtor country's central bank." *Id.* at 3569.

**71.** *See id.* at 3049–50 (TAC ¶ 61).

**72.** *See id.* at 3056 (TAC ¶ 75).

**73.** In *Seijas,* Banco de la Nación also allegedly made favorable loans to Argentina "in violation of its governing charter" and "to individuals and corporations" at the Republic's behest, but we held that this was not sufficient to establish that the bank lacked independence. *See* 502 Fed.Appx. at 21; *ante* note 55.

**74.** *See* J.A. at 3066–76 (TAC ¶¶ 97–113).

**75.** *See, e.g., id.* at 3593 (U.S. Treasury Department's Annual Report to Congress, covering Nov. 1, 1996 to Oct. 31, 1998) (describing the coordinated June 1998 intervention in the foreign exchange markets by U.S. monetary authorities); *id.* at 3610 (handbook published by the Centre for Central Banking Studies) ("[H]owever independent a central bank is, the ultimate decisions on a country's currency . . . are usually taken by the government[.]").

**76.** *Id.* at 3570–71 n. *.

were the result of Argentina's substantial control over the business decisions or daily functions of BCRA.[77] Thus, these actions, standing alone, are not the type of activities that illustrate a complete takeover of BCRA's day-to-day operations by the Republic.[78]

Because the facts alleged do not establish that the Republic exercised extensive control over BCRA's day-to-day operations, the first prong of the *Bancec* test has not been met.

### b. Fraud or Injustice

■■■ The second prong of the *Bancec* alter-ego test asks whether the recognition of BCRA as a separate entity would work a "fraud or injustice." The purpose of this prong is to prevent foreign states from "avoid[ing] their obligations by engaging in abuses of corporate form." [79]

For instance, in *Bancec* itself,[80] the presumption that Cuba's instrumentality—Bancec—was a separate juridical entity was rebutted, because Cuba had dissolved Bancec and taken complete control of its assets in 1961. Because Cuba effectively absorbed Bancec, the Supreme Court granted Citibank recourse against Cuba as the controlling principal and real beneficiary of the lawsuit that Bancec had filed

against Citibank. Similarly, in *Bridas S.A.P.I.C.*,[81] the Fifth Circuit found "fraud or injustice" where Turkmenistan dissolved a state-owned oil company that was in breach of a joint venture with plaintiff, and replaced it with an under-capitalized state-owned oil company endowed with newly-enacted immunity protection. And in an unpublished district court case relied on by plaintiffs, *Kensington International Ltd. v. Republic of Congo*,[82] the Republic of Congo structured its relationship to its purportedly independent oil company by, *inter alia:* (1) designing the company's corporate structure to allow Congo to engage in "unnecessarily complex transactions and charades for the purpose of confounding its creditors"; [83] (2) passing all proceeds from oil sales on to the government, rather than permitting the company to exercise its right to collect a percentage on transactions; and (3) commingling state and company assets.

The common thread in these cases is that the sovereign states at issue abused the corporate form. In *Bancec*, Cuba sought relief in a court of the United States while simultaneously trying to shield itself from liability by asserting its claim through its dissolved instrumentali-

---

**77.** *See, e.g., McKesson Corp.*, 52 F.3d at 352 (finding *Bancec* presumption rebutted where "[r]outine business decisions, such as declaring and paying dividends to shareholders and honoring [the instrumentality's] contractual commitments" were dictated by the sovereign state); *Hester Int'l Corp.*, 879 F.2d at 178 (giving example of extensive control where "all checks in excess of a certain amount [had to] be signed by a government-appointed director, a governmental agency was required to approve all invoices for shipments exceeding a certain amount, and the ... government generally exercised direct control over its operation").

**78.** By rejecting plaintiffs' argument that BCRA should be held liable for all of Argenti-

na's debts—*see* SPA at 20–21 (9/25/13 Tr. 19:25–20:1) ("I don't buy the idea that BCRA is liable for all the debts of the [R]epublic.")— the District Court implicitly agreed that the pleadings do not demonstrate that BCRA has become the Republic's alter ego for all purposes. *See also ante* note 56.

**79.** *Letelier*, 748 F.2d at 794.

**80.** 462 U.S. at 615–16, 632, 103 S.Ct. 2591.

**81.** 447 F.3d at 417.

**82.** No. 03 Civ. 4578(LAP), 2007 WL 1032269 (S.D.N.Y. Mar. 30, 2007).

**83.** *Id.* at *9.

ty. In *Bridas,* Turkmenistan transferred assets from one instrumentality to another in order to escape liability.[84] And in *Kensington,* Congo created a "sham" entity with purported sovereign immunity in order to shield its own assets from judgment creditors.

■■■ Plaintiffs' allegations here fall far short of the flagrant frauds and injustices exhibited in these other cases. At bottom, plaintiffs' claim is that it would be a fraud or injustice to allow Argentina to use funds from BCRA to pay certain "preferred" creditors while at the same time "stiffing" plaintiffs. As noted above, at least in the case of the IMF, there is nothing irregular or fraudulent about Argentina recognizing a preference for repaying one set of creditors over another.

Moreover, plaintiffs *do not* allege that BCRA's separate juridical status has been actively used by Argentina to block plaintiffs' enforcement attempts against Argentina itself, or that Argentina has transferred *its* funds to BCRA in order to shield them from plaintiffs. Although plaintiffs do allege that BCRA transferred some of the funds deposited in its FRBNY account to the Bank of International Settlements in Switzerland, this action did nothing to frustrate plaintiffs' ability to collect on their judgments against Argentina. As we held in *BCRA II,* funds deposited in BCRA's own account were in any

event immune from attachment.[85] Therefore, as a practical matter, BCRA was only guilty of moving funds from one attachment-proof account to another.

Plaintiffs' factual allegations simply do not show that Argentina has used BCRA to frustrate the collection efforts of its creditors, or that Argentina treated BCRA as a "sham" entity to hide its own assets. These allegations simply do not establish that the recognition of BCRA's separate status would work a "fraud or injustice" within the meaning of *Bancec.*

Because the TAC fails to counter, much less overcome, the presumption that BCRA and Argentina are legally separate entities, BCRA does not constitute Argentina's "alter ego" for the purposes of this suit. Argentina's express waiver of its own sovereign immunity in the FAA, therefore, may not be imputed to BCRA. Accordingly, we conclude that the express waiver exception— § 1605(a)(1)—does not apply to this case.[86]

## B. Commercial Activity

■■■ The second exception to sovereign immunity relied upon by the District Court is the "commercial activity" exception codified at 28 U.S.C. § 1605(a)(2), which, in relevant part, provides that a foreign state is not immune in an action "based upon a commercial activity carried on in the Unit-

---

84. *See also Patin v. Thoroughbred Power Boats, Inc.,* 294 F.3d 640, 648–49 (5th Cir. 2002) (piercing the corporate veil where a company transferred its operations from one party to another to avoid liability).

85. *BCRA II,* 652 F.3d at 196–97 (citing 28 U.S.C. § 1611(b)(1)).

86. If we were to determine that these allegations *did* rebut the *Bancec* presumption, we would then be required to resolve two additional legal questions before recognizing a waiver of BCRA's sovereign immunity under § 1605(a)(1): (1) whether Argentina's waiver

of immunity in the FAA covered a declaratory judgment such as the one requested here— *i.e.,* one designed to permit attachment of unspecified funds in unnamed foreign jurisdictions; and (2) whether that waiver may be imputed to BCRA, such that BCRA would then be held liable for all of plaintiffs' judgments against Argentina. Because we conclude that the TAC fails at the first step—*i.e.,* that the TAC does not rebut the presumption that BCRA is a separate juridical entity—we need not, and do not, reach these additional questions.

ed States." This exception applies only when there exists "a degree of closeness" between the gravamen of plaintiffs' complaint and the commercial activities engaged in by the foreign state or instrumentality.[87]

Here, the gravamen of the TAC is that BCRA, as Argentina's purported alter ego, is liable for the judgments resulting from Argentina's default on its FAA bonds.[88] As noted above, BCRA was not a party to the FAA and was not involved in Argentina's decision to cease making principal and interest payments on FAA bonds. Therefore, the gravamen of plaintiffs' claim on the merits is based on a series of actions taken by BCRA *after* 2001.

 However, none of these actions after 2001—loans made by BCRA to Ar-

gentina, coordination of monetary policy, the appointment and removal of BCRA governors—are commercial activities that occurred in the United States.[89] In fact, BCRA's only alleged commercial activity in the United States was its use of its FRBNY account to purchase dollars. Plaintiffs assert that these dollars allowed BCRA to make loans to Argentina, which Argentina then used to repay dollar-denominated debts to creditors other than plaintiffs.[90]

The fact that these dollars were delivered to BCRA's account with the FRBNY, however, is entirely incidental to plaintiffs' claim on the merits—that claim would be no different had BCRA deposited those dollars in any other bank abroad. In this way, plaintiffs' claims are similar to those asserted in *Kensington International Ltd.*

**87.** *Kensington Int'l Ltd. v. Itoua,* 505 F.3d 147, 156 (2d Cir.2007) (internal quotation marks omitted); *see also Saudi Arabia v. Nelson,* 507 U.S. 349, 357, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) (in order for a suit to be based upon commercial activity carried on in the United States, that commercial activity must form the foundation for "those elements of a claim that, if proven, would entitle [the] plaintiff to relief under his theory of the case"); *Reiss v. Société Centrale Du Groupe Des Assurances Nationales,* 235 F.3d 738, 747 (2d Cir.2000) ("To sustain jurisdiction on this basis, there must be a significant nexus ... between the commercial activity in this country upon which the exception is based and a plaintiff's cause of action.") (citation and internal quotation marks omitted); *Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.,* 204 F.3d 384, 390 (2d Cir.2000) (the FSIA's commercial activity exception requires "a degree of closeness between the acts giving rise to the cause of action and those needed to establish jurisdiction that is considerably greater than common law causation requirements"). *See also ante* note 4.

**88.** As stated above, the TAC's claim on the merits is that the BCRA is the "alter ego" of Argentina and, therefore, BCRA's funds should be generally attachable to satisfy Ar-

· gentina's debts. Separately, plaintiffs have invoked BCRA's "alter ego" status as a basis for waiving BCRA's sovereign immunity. Accordingly, the facts underlying plaintiffs' merits and jurisdictional claims overlap significantly. This opinion concerns only the basis for jurisdiction—*i.e.,* the waiver of BCRA's sovereign immunity—not the merits of plaintiffs' request for a declaratory judgment.

**89.** *See* 28 U.S.C. § 1605(a)(2) (stating in relevant part that a foreign state is not immune from any action "based upon a commercial activity carried on *in the United States* ") (emphasis supplied).

**90.** As we previously noted, it is entirely unremarkable that BCRA maintained a foreign-central-bank account at the FRBNY. *See BCRA II,* 652 F.3d at 177 ("Like many central banks around the world, BCRA maintains a foreign central bank account at the FRBNY in which, among other things, it manages dollar-denominated reserve holdings."); *see also id.* at 177 n. 7 ("FRBNY provides accounts in which approximately 250 foreign central banks and monetary authorities manage foreign exchange reserve holdings and other property.").

*v. Itoua.*[91] There, a creditor of the Republic of Congo alleged that a state-owned oil company had entered into prepayment agreements in exchange for oil rights, which caused Congo's oil revenues to be diverted away from the creditor. The creditor attempted to invoke the FSIA's commercial activity exception on the grounds that: (1) the oil at issue was shipped to the United States; and (2) the premium payments were made in the United States. We rejected the creditor's argument, however, reasoning that the requisite nexus did not exist between the commercial activity in the United States (the shipment of oil and the premium payments), and the gravamen of the complaint (the prepayment agreements executed in France). Because the alleged activity in the United States was entirely incidental to the improper conduct, we declined to apply the commercial-activity exception to waive sovereign immunity.[92]

As in *Kensington,* the claim here also lacks any nexus between BCRA's commercial activity in the United States (the purchase of dollars through the FRBNY account) and the gravamen of the complaint (the alter-ego claim, which turns on loans made by BCRA to Argentina in Argentina). It is similarly incidental that BCRA purchased these dollars using an account in the United States. Whatever adverse consequences plaintiffs allegedly suffered from the BCRA's loans to Argentina, they would have suffered the same consequences had BCRA used any other bank account in the United States or abroad.

Accordingly, adopting plaintiffs' theory for jurisdiction here would dramatically expand the scope of the commercial-activity exception to sovereign immunity. Any allegation of the wrongful use of dollars outside the United States would conceivably lead to a sovereign immunity waiver, so long as the plaintiff could show that these dollars were acquired in U.S.-based transactions. Given New York's role as a financial center, every country and every central bank would be at risk of losing their sovereign immunity on this basis. As the United States argued as *amicus* in *BCRA II,* weakening the immunity from suit or attachment traditionally enjoyed by the instrumentalities of foreign states could lead foreign central banks, in particular, to "withdraw their reserves from the United States and place them in other countries. Any significant withdrawal of these reserves could have an immediate and adverse impact on the U.S. economy and the global financial system." [93]

Because such a capacious understanding of the commercial-activity exception is inconsistent with the FSIA's presumption that foreign states and instrumentalities enjoy sovereign immunity, we decline to adopt plaintiffs' proposed rule. Accordingly, we hold that the commercial-activity exception to sovereign immunity— § 1605(a)(2)—does not apply to this case.

## CONCLUSION

We do not condone or excuse Argentina's continuing failure to pay the judgments duly entered against it by the District Court. Our decision that BCRA may invoke its own sovereign immunity in this lawsuit is not intended to allow the Repub-

---

**91.** 505 F.3d 147 (2d Cir.2007).

**92.** *Id.* at 156–58.

**93.** J.A. at 3550–51 (citation omitted); *cf. Shipping Corp. of India v. Jaldhi Overseas Pte Ltd.,* 585 F.3d 58, 62 (2d Cir.2009) ("Undermining the efficiency and certainty of [electronic] fund transfers in New York could, if left uncorrected, discourage dollar-denominated transactions and damage New York's standing as an international financial center.").

lic to avoid its bargained-for obligations, or to continue shirking the debts it has the ability to pay, although we suspect that this will be a predictable and unfortunate outcome of our decision.

Nonetheless, BCRA is entitled to invoke its own sovereign immunity as a defense to this lawsuit, unless one of the exceptions codified in the Foreign Sovereign Immunities Act ("FSIA") applies. Because both of the exceptions relied upon by plaintiffs fail as a matter of law, the District Court erred in denying BCRA's motion to dismiss under the FSIA.

In summary, we hold the following:

(1) We have jurisdiction under the collateral-order doctrine to review the District Court's threshold determination that BCRA waived its sovereign immunity pursuant to 28 U.S.C. § 1605(a)(1) (the express waiver exception) and 28 U.S.C. § 1605(a)(2) (the commercial activity exception).

(2) *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (*"Bancec"*) sets a high bar for when an instrumentality will be deemed an alter ego of its sovereign state. On these facts, neither prong of the *Bancec* test is satisfied—Argentina does not exercise sufficiently extensive control over BCRA's day-to-day operations, and recognizing BCRA's separate status would not constitute a "fraud or injustice" within the meaning of *Bancec.* Accordingly, Argentina's sovereign-immunity waiver in the FAA may not be imputed to also waive BCRA's independent sovereign immunity.

(3) BCRA's use of its FRBNY account is too incidental to the gravamen of plaintiffs' claim to serve as the basis for waiving BCRA's sovereign immunity under the commercial-activity exception to the FSIA.

Accordingly, we **REVERSE** the District Court's order of September 26, 2013, and we **REMAND** the cause with instructions to dismiss the Third Amended Complaint with prejudice.