# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

---

AUGUST TERM 2020
Nos. 19-3550, 19-3562,
19-3747, 19-4017,
19-4021, 19-4147

**GATER ASSETS LIMITED,**
*Petitioner-Appellee-Cross-Appellant,*

**LLOYD'S UNDERWRITERS AT LONDON,**
*Petitioner,*

v.

**AO MOLDOVAGAZ, REPUBLIC OF MOLDOVA,**
*Respondents-Appellants-Cross-Appellees,*

**AO GAZSNABTRANZIT,**
*Respondent.*[*]

---

On Appeal from the United States District Court
for the Southern District of New York

ARGUED: OCTOBER 20, 2020
DECIDED: JUNE 22, 2021

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

Before: RAGGI, SULLIVAN, and MENASHI, *Circuit Judges*.

Appellants AO Moldovagaz and the Republic of Moldova appeal the judgment of the U.S. District Court for the Southern District of New York (Preska, J.) entered on November 1, 2019—and explained in the district court's opinions of September 30, 2018, and September 27, 2019—in favor of Appellee Gater Assets Limited. Gater sought to renew a default judgment, which the district court entered in 2000, that enforced a Russian arbitration award in favor of Lloyd's Underwriters against the appellants. Lloyd's assigned its default judgment to Gater in 2012. The district court entered a renewal judgment in Gater's favor after concluding that it had personal jurisdiction over the appellants as well as subject-matter jurisdiction over the renewal claims. We disagree with those conclusions.

First, the district court lacked personal jurisdiction over Moldovagaz. The Due Process Clause prohibits federal courts from exercising personal jurisdiction over Moldovagaz because Moldovagaz has no contacts with the United States. We have recognized an exception to this rule when a defendant is a foreign sovereign or a sovereign's alter ego. But contrary to the district court's conclusion, Moldovagaz is not an alter ego of the Republic of Moldova.

Second, the district court lacked subject-matter jurisdiction over Gater's claim for renewal against the Republic of Moldova. The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1391(f), 1441(d), 1602-11, provides that federal courts lack subject-matter jurisdiction over claims brought against foreign states unless one of the FSIA's immunity exceptions applies. The Republic of Moldova is a foreign state and no immunity exception applies to

Gater's claim against it. The district court invoked the FSIA's exception for confirming awards that are issued pursuant to a qualifying arbitration agreement "made by the foreign state." 28 U.S.C. § 1605(a)(6). The Republic of Moldova, however, was not a party to the underlying arbitration agreement and no equitable theory, even assuming such theories apply under § 1605(a)(6), supports abrogating the Republic's sovereign immunity in this case.

Accordingly, we **VACATE** the district court's judgment in Gater's renewal action and **REMAND** with instructions to dismiss the renewal action for lack of jurisdiction. We nevertheless **AFFIRM** the district court's refusal to vacate its original default judgment because the appellants have failed to demonstrate that the district court had no arguable basis to exercise jurisdiction to enter that judgment.

———————

MICHAEL MCGINLEY, Dechert LLP, Philadelphia, PA (Selby P. Brown, Dechert LLP, Philadelphia, PA; May Chiang, Dechert LLP, New York, NY; and Dennis H. Hranitzky, Quinn Emanuel Urquhart & Sullivan, New York, NY, *on the brief*), *for Petitioner-Appellee-Cross-Appellant Gater Assets Limited*.

ROBERT KRY (Lauren M. Weinstein and Leonid Grinberg, *on the brief*), MoloLamken LLP, New York, NY, *for Respondent-Appellant-Cross-Appellee AO Moldovagaz*.

EDWARD BALDWIN, Steptoe & Johnson LLP, Washington, DC, *for Respondent-Appellant-Cross-Appellee Republic of Moldova*.

———————

19-3550(L)
*Gater Assets Ltd. v. AO Moldovagaz*

MENASHI, *Circuit Judge*:

This suit involves a longstanding dispute over Moldovan gas debts. In 2000, the U.S. District Court for the Southern District of New York (Preska, J.) entered a default judgment against Respondents-Appellants—the Republic of Moldova ("Republic") and the Moldovan corporation AO Moldovagaz ("Moldovagaz")—in favor of Lloyd's Underwriters ("Lloyd's"), a British underwriters association. The default judgment confirmed a Russian arbitration award granted to Lloyd's after Moldovagaz's predecessor-in-interest, AO Gazsnabtranzit, defaulted on debt it owed to a Russian gas supply company named Gazprom. Lloyd's had reinsured the debt. In 2012, Lloyd's assigned its right to collect on the default judgment to Petitioner-Appellee Gater Assets Limited ("Gater"), a British Virgin Islands company. With the limitations period for enforcing the default judgment nearing its end, Gater brought a renewal action in the same district court pursuant to New York Civil Practice Law and Rules § 5014, which allows for the renewal of a judgment and the restarting of its limitations period. On November 1, 2019, the district court entered a renewal judgment in Gater's favor against both Moldovagaz and the Republic. The district court explained its underlying reasoning in opinions filed on September 30, 2018,[1] and September 27, 2019.[2]

---

[1] *See Gater Assets Ltd. v. AO Gazsnabtranzit* (*Gater I*), No. 16-CV-4118, 2018 U.S. Dist. LEXIS 171350 (S.D.N.Y. Sept. 30, 2018).

[2] *See Gater Assets Ltd. v. AO Gazsnabtranzit* (*Gater II*), 413 F. Supp. 3d 304 (S.D.N.Y. 2019).

Moldovagaz and the Republic contest the district court's jurisdiction to enter the renewal judgment. Because this case involves only foreign parties and a cause of action that arises under New York state law, this suit would seem to fall outside the subject-matter jurisdiction of the federal courts under Article III of the Constitution. A lawsuit between foreign parties does not implicate diversity jurisdiction, *see Mossman v. Higginson*, 4 U.S. (4 Dall.) 12, 14 (1800), and a claim under New York state law does not generally "aris[e] under ... the Laws of the United States," U.S. Const. art. III, § 2; *see Wilson v. Sandford*, 51 U.S. (10 How.) 99, 101-02 (1850).

Because of the particular respondents, however, jurisdiction may exist pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1391(f), 1441(d), 1602-11. The FSIA provides federal district courts with "original jurisdiction" over "any nonjury civil action against a foreign state as defined in [the FSIA] ... with respect to which the foreign state is not entitled to immunity either under [the FSIA] or under any applicable international agreement." *Id.* § 1330(a). In *Verlinden B.V. v. Cent. Bank of Nigeria*, the Supreme Court held that this jurisdictional grant, when viewed in light of the FSIA as a whole, suffices to provide federal courts with arising-under jurisdiction. 461 U.S. 480, 496-97 (1983). Therefore, if the respondents are foreign states for the purposes of the FSIA, then the district court had subject-matter jurisdiction over Gater's renewal action so long as an exception to the general rule of foreign sovereign immunity applies.

Yet subject-matter jurisdiction is not enough by itself. A court must also have personal jurisdiction over a party in order to enter a binding judgment against it. The FSIA provides that a court with subject-matter jurisdiction pursuant to the FSIA also has "[p]ersonal

5

jurisdiction over a foreign state" so long as "service [was] made" in accordance with the FSIA's service rules. 28 U.S.C. § 1330(b). Neither Moldovagaz nor the Republic argues that it did not receive proper service. Still, the Due Process Clause of the Fifth Amendment independently prohibits federal courts from exercising personal jurisdiction over parties that lack "minimum contacts" with the court's forum. *See Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 330-31 (2d Cir. 2016).

That rule, too, has an exception. We have held that foreign states do not enjoy due process protections from the exercise of the judicial power because foreign states, like U.S. states, are not "persons" for the purposes of the Due Process Clause. *See Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 399 (2d Cir. 2009); *see also* U.S. Const. amend. V ("[N]or shall any person ... be deprived of life, liberty, or property, without due process of law."). When applying the Fifth Amendment, moreover, we do not define a foreign state in the same way the FSIA does. The FSIA's definition of a foreign state includes both the sovereign itself and its agencies and instrumentalities, which are separate legal persons from the sovereign. *See* 28 U.S.C. § 1603(a)-(b). Yet when it comes to the Fifth Amendment, we have indicated—and today hold directly—that only the sovereign itself and its "alter egos" are not "persons." Agencies and instrumentalities of foreign sovereigns retain their status as "separate legal person[s]," *id.* § 1603(b)(1), and receive protection from the exercise of personal jurisdiction under the Due Process Clause.

All told, the requirements for exercising jurisdiction over the claims against each Respondent-Appellant may be simply stated. First, to pursue its claim for a renewal judgment against Moldovagaz,

Gater must establish (1) that Moldovagaz is a foreign state for the purposes of the FSIA and that an FSIA immunity exception applies (thus allowing the exercise of subject-matter jurisdiction), and (2) that Moldovagaz either has minimum contacts with the district court's forum or is an alter ego of the Republic (thus allowing the exercise of personal jurisdiction). Second, because the Republic is unquestionably a foreign sovereign, Gater's claim for a renewal judgment against it must fit within an exception to sovereign immunity under the FSIA (thereby allowing the exercise of both subject-matter jurisdiction and personal jurisdiction).

As we explain below, the record here fails to establish that Gater's renewal action meets the jurisdictional requirements for its claims against each Respondent-Appellant. With respect to Moldovagaz, Gater concedes that Moldovagaz has no contacts with the United States. And, contrary to the district court's conclusion, Moldovagaz is not an alter ego of the Republic. The Republic neither exercises "extensive[] control" over Moldovagaz nor abused the corporate form such that respecting Moldovagaz's separate juridical personhood "would work fraud or injustice." *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba* (*Bancec*), 462 U.S. 611, 629 (1983). Therefore, the district court lacked personal jurisdiction over Moldovagaz.

With respect to the Republic, Gater's claim against it does not fit within an FSIA immunity exception. The district court invoked the exception for actions to confirm arbitration awards issued pursuant to a qualifying agreement "made by the foreign state." 28 U.S.C. § 1605(a)(6). But the Republic was not a party to the underlying arbitration agreement. Recognizing this fact, the district court relied on direct benefits estoppel to hold that the immunity exception

7

nevertheless applied. It is not clear to us, however, that a theory of direct benefits estoppel can establish that a foreign state "made" an agreement to which it was not a party. But even assuming that it can, the direct benefits theory cannot support subject-matter jurisdiction here because Gater fails to demonstrate either that the agreement "expressly provide[d] [the Republic] with a benefit" or that the Republic "actually invoke[d] the contract to obtain its benefit." *Trina Solar US, Inc. v. Jasmin Solar Pty Ltd*, 954 F.3d 567, 572 (2d Cir. 2020). The district court, therefore, lacked subject-matter jurisdiction over Gater's renewal claim against the Republic.

Accordingly, we vacate the district court's judgment in Gater's renewal action and remand with instructions to dismiss the renewal action for lack of jurisdiction. We nevertheless affirm the district court's refusal to vacate its original default judgment because the appellants have failed to demonstrate that the district court had no arguable basis to exercise jurisdiction to enter that judgment.

## BACKGROUND

### I

Moldovans rely on natural gas supplied by Gazprom, a gas supply company that is majority-owned by the Russian government. Many Moldovan customers—especially those in the autonomous region of Transnistria—use the gas without providing full payment. *See* J. App'x 1181-82. As a result of this and other factors, the Republic and some Moldovan gas entities accumulated large debts to Gazprom in the early 1990s. To help address the mounting debt, in 1995 the Republic formed a corporation called Gazsnabtranzit by privatizing several Moldovan state-owned gas transmission companies and giving Gazprom a majority equity stake in the resulting corporation.

8

When that effort did not succeed, the Republic, Transnistria, and Gazprom incorporated Moldovagaz in 1998. To form Moldovagaz, each of the parties contributed its stake in Gazsnabtranzit. Combined, those stakes were valued at $170.5 million. Additionally, the Republic and Transnistria contributed other gas holdings and property worth $120 million, bringing Moldovagaz's total capitalization to $290.5 million. In return, Gazprom reduced the outstanding debt owed to it by $60 million.

The Republic owns 35.3 percent of Moldovagaz, Gazprom owns 50 percent, and Transnistria owns 13.4 percent. In 2005, Transnistria granted Gazprom the right to administer its stake in Moldovagaz. As a result, Gazprom controls 63.4 percent of Moldovagaz's shares, and its representatives hold a majority of the seats on Moldovagaz's governing bodies. The Republic has remained involved in Moldovagaz's affairs from its inception.

## II

In 1996, Gazsnabtranzit entered into an agreement with Gazprom that set the price and quantity terms for the Gazprom gas that Gazsnabtranzit would deliver to Moldovans in 1997. The agreement specified that the parties would arbitrate any disputes arising thereunder before the International Commercial Arbitration Court of the Chamber of Commerce of the Russian Federation in Moscow ("ICAC"). The next year, a dispute developed between Gazprom and Gazsnabtranzit regarding money Gazprom claimed it was owed under the agreement. Lloyd's Underwriters, Gazprom's ultimate reinsurers, covered the allegedly unpaid debt. Lloyd's, which became subrogated to Gazprom's rights under the agreement, then brought an arbitration action against Gazsnabtranzit in the ICAC

9

pursuant to the arbitration clause. On November 12, 1998, the ICAC awarded Lloyd's $8.5 million plus costs against Gazsnabtranzit.

In December 1999, Lloyd's filed a petition in the U.S. District Court for the Southern District of New York to confirm the award against Gazsnabtranzit, Moldovagaz (which by that time had succeeded Gazsnabtranzit), and the Republic. Lloyd's brought suit pursuant to legislation implementing the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"). *See* 9 U.S.C. §§ 201-08. After the defendants failed to appear, the district court entered a default judgment for Lloyd's in July 2000. In 2012, Lloyd's assigned that judgment to Gater. As the twenty-year statute of limitations to collect the judgment approached, Gater filed an action under New York's "renewal" statute, N.Y. C.P.L.R. § 5014, which permits a plaintiff to obtain a renewed judgment with its own limitations period by bringing a new action on an existing judgment. This time, Moldovagaz and the Republic appeared and sought dismissal of Gater's renewal action pursuant to Federal Rule of Civil Procedure 12(b)(1) (lack of subject-matter jurisdiction) and 12(b)(2) (lack of personal jurisdiction). Moldovagaz and the Republic also moved pursuant to Rule 60(b)(4) to vacate the district court's original 2000 default judgment as void due to a lack of jurisdiction.

The district court denied the motions and granted judgment in favor of Gater in its renewal action. The district court concluded that Moldovagaz was an "organ" of the Republic and therefore qualified as a foreign state under the FSIA. *Gater I*, 2018 U.S. Dist. LEXIS 171350, at *22-43. This conclusion meant that the district court would have subject-matter jurisdiction over the suit against Moldovagaz so long as an exception to sovereign immunity under the FSIA applied. *See*

10

28 U.S.C. § 1330(a). The district court also held that Moldovagaz was an "alter ego" of the Republic and that the court therefore had personal jurisdiction over Moldovagaz so long as it was properly served pursuant to the FSIA. *See* 28 U.S.C. § 1330(b); *Gater II*, 413 F. Supp. 3d at 313-25.

In addition, the district court held that neither the Republic nor Moldovagaz was entitled to immunity under the FSIA because Gater's action for a renewal judgment fit into the FSIA's immunity exception for actions brought "to confirm an award made pursuant" to an arbitration "agreement made by the foreign state" that is governed by "a treaty or other international agreement in force for the United States." *Gater II*, 413 F. Supp. 3d at 325-28 (quoting 28 U.S.C. § 1605(a)(6)); *Gater I*, at *53-56 (same). Finally, the district court ruled that the Southern District of New York was a proper venue for the renewal action because "a substantial part of the events or omissions giving rise to the claim," namely the original 2000 suit that resulted in the default judgment Gater sought to renew, occurred in the Southern District of New York. *Gater II*, 413 F. Supp. 3d at 328 (quoting 28 U.S.C. § 1391(f)(1)). Moldovagaz and the Republic timely appealed.

### STANDARD OF REVIEW

We review a district court's factual determinations in making jurisdictional rulings under the FSIA for clear error. *See Frontera*, 582 F.3d at 395 (personal jurisdiction); *Filler v. Hanvit Bank*, 378 F.3d 213, 216 (2d Cir. 2004) (subject-matter jurisdiction). Under this standard, we will disturb the district court's findings only if we have a "definite and firm conviction" that the district court made a mistake. *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985). At the same time, we review the district court's legal conclusions on these issues de novo. *EM Ltd.*

11

*v. Banco Central de la República Argentina*, 800 F.3d 78, 89 (2d Cir. 2015) (personal jurisdiction); *Filler*, 378 F.3d at 216 (subject-matter jurisdiction). Here, because we identify certain clear errors of fact, we will discount those factual findings and determine de novo if the district court had jurisdiction over Gater's renewal action with respect to Moldovagaz and the Republic.

Regarding the Rule 12(b)(1) motions to dismiss Gater's renewal claims for lack of subject-matter jurisdiction, once a movant such as the Republic "present[s] a *prima facie* case that it is a foreign sovereign," the non-movant then "has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 241 (2d Cir. 2002) (internal quotation marks and emphasis omitted). If the non-movant can satisfy that burden of production, the foreign state bears the "ultimate burden of persuasion by a preponderance of the evidence." *Id.* at 242.[3] As for Moldovagaz's Rule 12(b)(2) motion to dismiss Gater's renewal claim for lack of personal jurisdiction, Gater bears the burden of showing that the district court had personal jurisdiction over Moldovagaz. *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003).

---

[3] The parties cite *Swarna v. Al-Awadi*, which stated that the plaintiff bears its burden of production "by a preponderance of the evidence." 622 F.3d 123, 143 (2d Cir. 2010). But our earlier cases indicate that the preponderance-of-the-evidence standard applies to the foreign sovereign's ultimate burden of persuasion, not to the plaintiff's burden of production. *See Virtual Countries*, 300 F.3d at 241-42. To the extent that these articulations of the standard conflict, we are bound to follow the earlier precedent. *See Tanasi v. New All. Bank*, 786 F.3d 195, 200 n.6 (2d Cir. 2015).

Moldovagaz and the Republic bear a heavier burden when it comes to the Rule 60(b)(4) motions to vacate the district court's original default judgment. A party moving for relief under Rule 60(b) generally must "present[] highly convincing ... evidence in support of vacatur" and "show good cause for the failure to act sooner and that no undue hardship be imposed on other parties." *Kotlicky v. U.S. Fid. & Guar. Co.*, 817 F.2d 6, 9 (2d Cir. 1987) (internal quotation marks and citation omitted); *see also United States v. Int'l Brotherhood of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001). "A motion to vacate a default judgment as void" under Rule 60(b)(4), however, usually "may be made at any time." *Grace v. Bank Leumi Tr. Co. of N.Y.*, 443 F.3d 180, 190 (2d Cir. 2006). Still, "[i]n the context of a Rule 60(b)(4) motion, a judgment may be declared void for want of jurisdiction only when the court 'plainly usurped jurisdiction,' or, put somewhat differently, when 'there is a total want of jurisdiction and no arguable basis on which it could have rested a finding that it had jurisdiction.'" *Cent. Vt. Pub. Serv. Corp. v. Herbert*, 341 F.3d 186, 190 (2d Cir. 2003) (quoting *Nemaizer v. Baker*, 793 F.2d 58, 65 (2d Cir. 1986)). Considering the general rule that a movant bears the burden in Rule 60(b) motions, *see Kotlicky*, 817 F.2d at 9, and that neither Moldovagaz nor the Republic argues on appeal that it lacked actual notice of the original action that led to the default judgment, we place the burden on Moldovagaz and the Republic to show that vacatur was warranted under the standard set out in *Herbert*. *See "R" Best Produce, Inc. v. DiSapio*, 540 F.3d 115, 126 (2d Cir. 2008) ("[I]n a collateral challenge to a default judgment under Rule 60(b)(4), the burden of establishing lack of personal

13

jurisdiction is properly placed on a defendant who had notice of the original lawsuit.").[4]

## DISCUSSION

The district court lacked jurisdiction over Gater's renewal action. Moldovagaz has no contacts with the United States and, contrary to the district court's conclusion, it is not an alter ego of the Republic. Due process protects a party from being subject to personal jurisdiction in a forum with which it has no connection. *See, e.g.*, *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Although we have denied this protection to foreign sovereigns and their alter egos, *see Frontera*, 582 F.3d at 399, that exception does not extend to all agencies or instrumentalities of foreign states as defined by the FSIA. Therefore, the district court lacked personal jurisdiction over Moldovagaz even if it is an agency or instrumentality of the Republic.

The Republic, meanwhile, was not a party to the arbitration agreement that the district court held triggered the FSIA's immunity exception for arbitral awards. The district court nevertheless bound the Republic to this arbitration agreement and abrogated its immunity under a theory of direct benefits estoppel. For the FSIA arbitration immunity exception to apply, however, the relevant agreement must have been "made by" the Republic, 28 U.S.C. § 1605(a)(6), and it is not clear to us that a direct benefits estoppel

---

[4] We express no view regarding whether an exception to the general rule that the movant bears the burden in a Rule 60(b) motion exists when circumstances indicate that a movant challenging personal jurisdiction lacked actual notice of the original lawsuit. *Cf. Middleton v. Green Cycle Hous., LLC*, 689 F. App'x 12, 13 (2d Cir. 2017) ("We need not resolve the issue of whether a defendant who concedes service, but not actual notice, bears the burden of disproving jurisdiction.").

theory can establish that a foreign state "made" an agreement to which it was not a party. But even assuming the point *arguendo*, direct benefits estoppel cannot support subject-matter jurisdiction here because Gater failed to demonstrate either that the agreement "expressly provide[d] [the Republic] with a benefit" or that the Republic "actually invoke[d] the contract to obtain its benefit." *Trina Solar*, 954 F.3d at 572. Because no other FSIA exception applies here, the district court lacked subject-matter jurisdiction over Gater's claim against the Republic.

Because we conclude that the district court was powerless to entertain Gater's renewal action against either Moldovagaz or the Republic, we do not address the other issues raised here—namely, whether Moldovagaz is an agency or instrumentality of the Republic as defined by the FSIA, whether a renewal action under N.Y. C.P.L.R. § 5014 qualifies as an action to "confirm" an arbitration award under the FSIA's arbitration immunity exception, and whether venue for the renewal action was proper in the district court.

**I**

The Due Process Clause of the Fourteenth Amendment protects a party from being subject to personal jurisdiction in a state court if it does not have "minimum contacts" with the forum state. *Int'l Shoe*, 326 U.S. at 316. This protection applies to domestic and foreign parties alike. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918-20 (2011); *Daimler AG v. Bauman*, 571 U.S. 117, 120-22 (2014). Although the Fourteenth Amendment does not limit the district court's power in this case,[5] we have held that the Fifth Amendment's

---

[5] Often, federal courts effectively face the same Fourteenth Amendment personal jurisdiction limitations as state courts. *See* Fed. R. Civ. P. 4(k)(1)(A)

Due Process Clause places similar constitutional constraints on the exercise of federal judicial power. *Waldman*, 835 F.3d at 330 ("This Court's precedents clearly establish the congruence of due process analysis under both the Fourteenth and Fifth Amendments.").[6]

Here, all parties agree that Moldovagaz "has no contacts with the United States." *Gater I*, 2018 U.S. Dist. LEXIS 171350, at *56 n.8 (quoting Gater's brief before the district court). Ordinarily, then, the district court would have lacked personal jurisdiction over Moldovagaz. Yet we have recognized an exception to the minimum contacts requirement when a sovereign state is the defendant. *See Frontera*, 582 F.3d at 399. Sovereign states may not invoke the protection of the Fifth Amendment's Due Process Clause because that

---

("Serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located."). That rule does not apply, however, when service is independently "authorized by a federal statute." Fed. R. Civ. P. 4(k)(1)(C). The FSIA authorizes service and personal jurisdiction so long as service is made pursuant to the FSIA's requirements. *See* 28 U.S.C. §§ 1330(b), 1608.

[6] Recently the Supreme Court has been careful to avoid addressing this issue. *See Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1783-84 (2017). But earlier decisions from the Court indicate that the Fifth Amendment's Due Process Clause limits the ability of a federal court to exercise personal jurisdiction over parties with no connection to the court's forum; the open question is whether, for the purposes of the Fifth Amendment, the court's forum consists of the entire United States or is limited to the state in which the court sits. *See Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 102 n.5 (1987); *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113 n.* (1987) (plurality opinion). Our court has endorsed the former view. *See Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998). This issue does not affect the outcome of this case because all parties agree that Moldovagaz has no contacts at all with the United States.

clause protects only "person[s]," and our precedent considers foreign states, like U.S. states, not to be "persons" under the Fifth Amendment. *Id.* (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966)). For that reason, a court may exercise personal jurisdiction over a foreign sovereign without regard to minimum contacts. *Id.*

Moldovagaz is a gas company rather than a sovereign. Still, we have held that entities that are alter egos of foreign sovereigns also cannot claim the protection of the Fifth Amendment's Due Process Clause. *Id.* at 400. To determine whether an entity is an alter ego of a foreign sovereign, we use the framework set out in the Supreme Court's decision in *Bancec*, 462 U.S. 611. *See Frontera*, 582 F.3d at 400. Although *Bancec* addressed whether a court could pierce the corporate veil between a corporation and a sovereign for the purpose of imposing liability, the standards set out in that case allow us to assess when a corporate entity may share an identity with the sovereign and therefore lack personhood for the purposes of the Fifth Amendment. *See id.* at 400-01; *see also GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 815, 817 (D.C. Cir. 2012) ("[When] a foreign sovereign controls an instrumentality to such a degree that a principal-agent relationship arises between them, the instrumentality receives the same due process protection as the sovereign: none.").

An alter ego relationship is not easily established. In *Bancec*, the Supreme Court explained that basic legal principles, the FSIA's legislative history, and considerations of comity and respect for foreign sovereigns all dictate that "duly created instrumentalities of a foreign state are to be accorded a presumption of independent status." 462 U.S. at 625-28. This "presumption of separateness is a strong one." *Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 252 (2d Cir. 2000). Nonetheless, it "may be overcome" in two

17

circumstances: "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created" or where recognizing the instrumentality's separate juridical status "would work fraud or injustice." *Bancec*, 462 U.S. at 628-29.

In applying *Bancec*'s "extensive control" prong, "the touchstone inquiry" is "whether the sovereign state exercises significant and repeated control over the instrumentality's day-to-day operations." *EM Ltd.*, 800 F.3d at 91.[7]  An entity does not become a sovereign's alter ego merely because it "assist[s]" the sovereign in carrying out the sovereign's "policies and goals." *EM Ltd.*, 800 F.3d at 94. To qualify as sufficiently extensive under *Bancec*, the sovereign's control over an entity must rise above the level that corporations would normally tolerate from significant shareholders or expect from government regulators. *See EM Ltd.*, 800 F.3d at 93 ("[A]n exercise of power incidental to ownership ... is not synonymous with control over the instrumentality's day-to-day operations."); *GSS Grp. Ltd. v. Nat'l Port Auth. of Liber.*, 822 F.3d 598, 606 (D.C. Cir. 2016) ("[A] government can wield power not only as [a] shareholder but also as [a] regulator.") (internal quotation marks omitted).

---

[7] Factors relevant to this inquiry include "whether the sovereign nation: (1) uses the instrumentality's property as its own; (2) ignores the instrumentality's separate status or ordinary corporate formalities; (3) deprives the instrumentality of the independence from close political control that is generally enjoyed by government agencies; (4) requires the instrumentality to obtain approvals for ordinary business decisions from a political actor; and (5) issues policies or directives that cause the instrumentality to act directly on behalf of the sovereign state." *EM Ltd.*, 800 F.3d at 91.

We also deem an entity to be the sovereign's alter ego when failing to do so "would work fraud or injustice." *Bancec*, 462 U.S. at 629. This occurs when a sovereign has "abused the corporate form" vis-à-vis the entity. *EM Ltd.*, 800 F.3d at 95; *see also De Letelier v. Republic of Chile*, 748 F.2d 790, 794 (2d Cir. 1984) (remarking that *Bancec*'s veil-piercing criteria relate to "classic abuse of corporate form"); *First Inv. Corp. of Marsh. Is. v. Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742, 755 (5th Cir. 2012) ("[T]o meet [the fraud or injustice] prong it is not sufficient ... merely to point out an injustice that would result from an adverse decision. Rather, [the plaintiff] must show how the [sovereign] manipulated [the instrumentality's] corporate form to perpetuate a fraud or injustice.").

## II

Applying *Bancec*'s standards to this appeal, we conclude that Moldovagaz is not an alter ego of the Republic.[8]

## A

To establish that Moldovagaz is the Republic's alter ego under *Bancec*'s "extensive control" prong, Gater must show that the Republic "exercises significant and repeated control over [Moldovagaz's] day-to-day operations." *EM Ltd.*, 800 F.3d at 91. Although the district court determined that the Republic "extensively controlled" Moldovagaz, most of the facts on which it relied are incidents of the Republic's due exercise of its ownership interest in or

---

[8] Because neither prong of the *Bancec* analysis justifies piercing the veil between Moldovagaz and the Republic, we do not address Moldovagaz's argument that Gazprom's majority stake in Moldovagaz necessarily forecloses the possibility that Moldovagaz is an alter ego of the Republic.

regulatory power over Moldovagaz. While some aspects of the Republic's relationship with Moldovagaz appear somewhat irregular, those aspects do not sufficiently demonstrate that the Republic "exercise[d] significant and repeated control over [Moldovagaz's] day-to-day operations." *EM Ltd.*, 800 F.3d at 91. These facts, therefore, are insufficient to rebut the strong "presumption" in favor of recognizing Moldovagaz's "independent status." *Bancec*, 462 U.S. at 627.

## 1. The Republic's Regulation of Moldovagaz

As the district court emphasized, the Republic sets the rates that Moldovagaz may charge customers for gas. *Gater II*, 413 F. Supp. 3d at 315, 317, 319, 325. The Republic does so through its ratemaking agency, the National Energy Regulatory Agency ("ANRE"). But governments routinely engage in ratemaking for companies in important sectors of their national economies, especially public utilities. *See generally* Charles F. Phillips Jr., *The Regulation of Public Utilities* (1988). That does not make those companies their alter egos.[9]

---

[9] On one occasion, the ANRE directed Moldovagaz to apply a new, reduced rate retroactively from the beginning of the calendar year. The district court thought it significant that the Moldovan prime minister had earlier voiced an opinion in favor of that reduced rate—as well as its retroactive application—and demanded that Moldovagaz work out a system to issue the appropriate refunds if the ANRE adopted his view. *See Gater II*, 413 F. Supp. 3d at 315, 319. A politician's statement in favor of a position, however, does not indicate alter ego status for an entity that later acts in accordance with that view. *See, e.g.*, Bernie Woodall & David Shepardson, *Chided by Trump, Ford Scraps Mexico Factory, Adds Michigan Jobs*, Reuters (Jan. 3, 2017).

Gater argues that Moldovagaz is a special case because the ANRE has historically set rates that force Moldovagaz to operate at a deficit. Yet Moldovagaz generated a profit from 2016 to 2018. Regardless, setting rates below cost does not necessarily indicate that a sovereign has crossed the boundary from regulator to alter ego. In fact, Moldovagaz has challenged the ANRE's rates in Moldovan courts over eighty times and complained about those rates to the International Monetary Fund, the World Bank, the European Energy Community, and the European Court of Human Rights.[10]

---

[10] The district court recognized that Moldovagaz has challenged the ANRE's rates, but it discounted this evidence because the Moldovagaz chairman behind these complaints, Alexandru Gusev, was eventually prosecuted by the Republic and fled the country. *See Gater II*, 413 F. Supp. 3d at 321. But the news article on which the district court relied to infer improper influence by the Republic merely reported that the Moldovan government opened the prosecution after investigations into "several fraudulent schemes to write off funds due to unaccounted gas losses and overestimate[s] in purchasing gas metering and other equipment" as well as "frauds in the purchase of currency." J. App'x 1805. Although one unnamed source quoted in the article surmised that the Republic undertook the prosecution to remove Gusev from his position, this speculation cannot support a finding that the Republic undertook a criminal investigation in bad faith. *See Chettri v. Nepal Rastra Bank*, 834 F.3d 50, 54 (2d Cir. 2016) ("[C]onclusory criticisms of the manner in which [a sovereign] has conducted [an] investigation are insufficient to prove a violation of international law."); *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992) ("[A]rgumentative inferences favorable to the party asserting jurisdiction should not be drawn."). Even if it could support such a finding, moreover, the fact that a sovereign would need to initiate a prosecution to drive a corporate executive out of the country would suggest that the sovereign did not exercise extensive control over the corporation's day-to-day activities in the first place. The record indicates that the Republic could not simply remove the chairman or direct Moldovagaz to change its policies. *See* J. App'x 1806 (reporting a statement

21

Gater also observes that the Republic mandates that Moldovagaz service and maintain the country's gas pipelines and regulates how Moldovagaz must carry out that obligation. But governments routinely enact maintenance requirements and safety regulations without rendering companies subject to that oversight the government's alter ego. *Compare* J. App'x 631-35 (Moldovan pipeline maintenance law), *with* 49 U.S.C. §§ 60101-41 (U.S. pipeline safety regulations).

Finally, Gater notes that the Moldovan Parliament has conducted two investigations into Moldovagaz in the past twenty years. A government's investigation of a business, however, is not remarkable. And these investigations in particular do not establish extensive control. The first investigation lasted one month and occurred as part of the Parliament's investigation of the entire Moldovan electricity and natural gas industry. The second investigation was focused on Moldovagaz, but it lasted only four months and apparently ended because the commission conducting the investigation could not subpoena witnesses or appoint experts. Thus, it appears that these investigations did not significantly impact Moldovagaz's operations.

## 2. The Republic's Exercise of Its Minority Interest in Moldovagaz

The Republic also exercises some authority over Moldovagaz via its ownership interest, but that authority is not enough to render

---

of the head of the Moldovan Parliament's Commission for Economy, Budget, and Finance) ("Moldovan authorities … have been trying to dismiss [the chairman] for a year already, but Moscow, which has four votes out of six in the Moldovagaz supervisory board, disagrees.").

Moldovagaz the Republic's alter ego. Moldovagaz's governance structure works as follows: Certain fundamental decisions, such as amending the corporate charter, are reserved for shareholder meetings. Aside from those decisions, Moldovagaz is governed by a Supervisory Council (akin to a board of directors) and managed by a Board (the duties and powers of which resemble those of officers). The Republic appoints some directors to the Supervisory Council, and many of its appointees have been civil servants. But these directors constitute only a minority of the Council; Gazprom appoints the majority of the Council's members. Gazprom's representatives also hold a majority of the positions on the Board.

Gater notes that Gazprom's representatives at shareholder and Council meetings do not vote on any transactions between Moldovagaz and Gazprom. According to Gater, these are the "most critical votes, which ultimately determine the day-to-day affairs" of Moldovagaz. Brief for Petitioner-Appellee-Cross-Appellant Gater Assets Limited 26. Moldovagaz's shareholders and Council, however, make important decisions that do not involve transactions with Gazprom. For example, the Council votes to approve nominees to Moldovagaz's Board. Moreover, the fact that Gazprom and its appointees are conflicted out of votes regarding possible self-dealing transactions is an unremarkable result of ordinary corporate law, which hardly establishes Moldovagaz as the alter ego of the Republic. *See, e.g.*, 3 William M. Fletcher et al., *Fletcher Cyclopedia of the Law of Corporations* § 913 (2020); N.Y. Bus. Corp. Law § 713; 8 Del. Code § 144.

Even if the inability of Gazprom's representatives to vote on transactions with Gazprom meant that the Republic effectively wields the power of a majority shareholder over Moldovagaz—a conclusion that the record does not support—such authority does not in itself

23

establish extensive control. Black letter corporate law provides that a corporation and its controlling shareholder are distinct entities. *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998); *see also Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 849 (D.C. Cir. 2000) ("If majority stock ownership and appointment of the directors were sufficient, then the presumption of separateness announced in *Bancec* would be an illusion.").[11]

The fact that the Republic appoints civil servants to exercise its ownership interest on Moldovagaz's Council similarly does not establish extensive control. Appointing loyal board members is a due "exercise of power incidental to ownership." *EM Ltd.*, 800 F.3d at 92-93. Indeed, "courts have consistently rejected the argument that the appointment or removal of an instrumentality's officers or directors, standing alone, overcomes the *Bancec* presumption because the exercise of such powers is not synonymous with control over the instrumentality's day-to-day operations." *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 203 (2d Cir. 2016) (internal quotation marks and citation omitted). To establish extensive control, Gater must additionally show that the Republic "use[d] its influence over these directors in order to interfere with the instrumentality's ordinary business affairs." *EM Ltd.*, 800 F.3d at 93. Gater identifies a provision of Moldovan law, which applies to all representatives of the

---

[11] Gater also points to Moldovagaz's 90 percent supermajority requirement for measures to pass at shareholder meetings as evidence of the Republic's extensive control of Moldovagaz. This argument fails for two reasons. First, whatever veto power this rule effectively gives to the Republic, it also effectively gives to Gazprom. Second, control over votes at shareholder meetings does not necessarily render the corporation the alter ego of the controlling entity. *See Transamerica Leasing*, 200 F.3d at 849.

Republic's ownership interest on corporate boards, that requires the Republic's representative to notify the Republic's government of any decision the board makes "that prejudices the interests of the State" and then submit "a substantiated demand concerning the repeal … or the suspension" of that decision. J. App'x 645. But as the district court noted, there is nothing in this law that provides that the board must then accede to that demand. *Gater I*, 2018 U.S. Dist. LEXIS 171350, at *34-35.

The Republic also nominates Moldovagaz's chief officer, the Board chairman. The Republic's nominee, however, must be approved by the Council, of which Gazprom's representatives constitute the majority. Undisputed evidence shows that the Council has blocked the Republic's nominee on at least two occasions in the past five years. Thus, even if direct appointment of corporate officers could establish that a shareholder controls a corporation's day-to-day operations, the record will not admit a finding that the Republic wielded such power over Moldovagaz. Moreover, as previously noted, at least one former Moldovagaz chairman repeatedly clashed with the Republic, further indicating that the Republic's ability to nominate the chairman does not mean that it controls Moldovagaz's day-to-day operations.[12]

### 3. Apparent Irregularities in the Republic-Moldovagaz Relationship

Gater identifies some instances in which the Republic arguably intruded into Moldovagaz's affairs to a degree atypical of a shareholder or government regulator. Yet this evidence still falls short

---

[12] *See supra* note 10 and accompanying text.

of establishing that the Republic "exercise[d] significant and repeated control over the instrumentality's day-to-day operations," *EM Ltd.*, 800 F.3d at 91, such that Gater can "overcome" the strong "presumption" in favor of Moldovagaz's "independent status," *Bancec*, 462 U.S. at 627-29.

First, Gater identifies an agreement the Republic signed with the Russian government in 2001 that dictated many aspects of Moldovagaz's business relationship with Gazprom. The agreement bound Moldovagaz to terms regarding the price it would pay Gazprom for gas, how Moldovagaz would make those payments to Gazprom, and the interest rate on Moldovagaz's debt to Gazprom. Moldovagaz responds that the agreement cannot evidence extensive control because it expressly provided that Gazprom and Moldovagaz would determine "amounts and conditions for the sale" of gas. J. App'x 948. Moldovagaz also posits that the agreement resembles trade agreements into which foreign states routinely enter with one another. For purposes of the personal jurisdiction inquiry in this case, we need not decide whether this kind of an agreement can establish extensive control.[13] That is because this 2001 agreement expired in 2006. Since then, Moldovagaz itself—not the Republic—has negotiated these issues with Gazprom. A bilateral agreement that

---

[13] While participation in negotiations can sometimes indicate control over ordinary business decisions, we have held that "nonspecific oversight of and participation in contractual negotiations, standing alone," does not suffice "to permit us to conclude that [instrumentalities] are mere shells for corporate activity." *Arch Trading*, 839 F.3d at 204 (internal quotation marks omitted). The Republic's role in the negotiation of this 2001 agreement, however, appears to exceed mere "nonspecific oversight ... and participation." *Id.*

terminated over a decade ago has limited probative value in determining whether Moldovagaz was the Republic's alter ego at the time of Gater's renewal action.[14]

Second, Gater relies on a 2014 Moldovan law that purportedly directed Moldovagaz to invest in a specific compressor station and pipeline. That decree, however, directed the Republic's Ministry of Economy—which administers the Republic's stake in Moldovagaz— to "facilitate the insertion" of these capital improvements into Moldovagaz's investment program. J. App'x 998. The district court called this a "striking example" of "active control over the day-to-day activities of Moldovagaz" and relied on it to conclude that the Republic "sets specific priorities for Moldovagaz." *Gater II*, 413 F. Supp. 3d at 315-16. But while the decree may have set priorities for the Ministry of Economy, the law did not direct Moldovagaz to take any action. The mere fact that the Republic, which maintains a 35.3 percent ownership interest in Moldovagaz, sought to advance certain investment goals does not show that the Republic exercised any outsized authority over Moldovagaz. Neither the district court nor Gater identifies evidence indicating that the Ministry of Economy forced Moldovagaz to invest in these improvements or even that it

---

[14] On a few occasions in its opinion, the district court implied that the Republic still binds Moldovagaz to contracts the Republic signs, dictates the price that Moldovagaz pays Gazprom for gas, and sets the interest rates on Moldovagaz's debts to Gazprom. *See Gater II*, 413 F. Supp. 3d at 315, 318-19. Such a finding lacks support in the record. To the extent the district court relied on Gater's briefs, *see id.*, the only evidence identified therein are the 2001 agreement that expired in 2006; the subsequent agreement, which was entered into by Moldovagaz; and the instance discussed above, *supra* note 9, in which the Republic's prime minster expressed a view in favor of retroactive application of a reduced rate.

could have done so, given that Gazprom controls Moldovagaz's governing bodies. Regardless, Gater does not produce any other examples of such control, and one instance of an alleged directed investment over the course of twenty years is insufficient as a matter of law to demonstrate "significant and repeated control over ... day-to-day operations." *EM Ltd.*, 800 F.3d at 91.

Third, Gater notes that the Republic has negotiated with Gazprom and the Russian government regarding important issues relating to Moldovagaz, including its debts to and contracts with Gazprom. High ranking Moldovan officials, including the president and prime minister, have met with Gazprom and Russian officials on several occasions to discuss these issues, often alongside members of Moldovagaz's Board. In light of *Bancec*'s admonition that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such," 462 U.S. at 626-27, we cannot conclude that a government's intercession on behalf of an important domestic utility company renders that company its alter ego—especially where the government's efforts are related to promoting the company's interests vis-à-vis other entities rather than directing the company's day-to-day operations. Additionally, the Republic and Gazprom are both shareholders of Moldovagaz and, as such, would normally negotiate over their jointly owned corporation's affairs. These negotiations do not indicate that the Republic, the minority shareholder, exercised more authority over Moldovagaz than Gazprom, the majority shareholder. Therefore, while the Republic may have a special interest in Moldovagaz's affairs, the negotiations do not indicate a principal-agent relationship sufficient to establish alter ego status.

Finally, Gater points out that, during one negotiation, the Moldovan president stated that Moldovagaz's debt to Gazprom "is the total debt of Moldova." J. App'x 1185. (After this statement caused a small uproar, the president clarified that "this is not a debt of Moldova, of the country's Government, but the debt of 'Moldovagaz.'" J. App'x 1560.) Similarly, a June 2018 press release from the Republic reported that "officials" at another meeting "noted that Moldova ... performs on time and in full the gas payments ... [and] has managed to pay some of the historical debts." J. App'x 1207. These statements reflect the Republic's special interest in Moldovagaz's affairs and might even serve as evidence that the Republic does not always recognize Moldovagaz's separate status— a factor we have recognized as relevant to the "extensive control" inquiry. *See EM Ltd.*, 800 F.3d at 91. But two isolated statements—one of which was retracted—do not suffice to establish extensive control by the sovereign over a corporation. *See Bancec*, 462 U.S. at 625 (noting that courts should generally honor the separate legal status of "utilities and industries which are given priority in the national development plan" in "countries which have insufficient private venture capital to develop").

### 4. The Failure to Show Extensive Control

In sum, Gater has failed to show that the Republic "exercises significant and repeated control over [Moldovagaz's] day-to-day operations." *EM Ltd.*, 800 F.3d at 91. Therefore, the district court erred in concluding that Moldovagaz is the Republic's alter ego under *Bancec*'s extensive control prong.

Gater insists that the facts here resemble those in a recent Third Circuit case in which the court concluded that Venezuela extensively

29

controlled the oil company Petróleos de Venezuela ("PDVSA"). *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 146-49 (3d Cir. 2019). In that case, the evidence showed that Venezuela actively interfered in the operations of PDVSA in a way that rendered PDVSA little more than Venezuela's political tool. The Venezuelan government forced PDVSA to sell oil "for no, or *de minimis*, consideration" and ordered sales to political allies at a "steep discount." *Id.* at 146-47. It also ordered the company to spend more than $4 billion on "social programs and projects" that had "nothing to do with its business." *Id.* Additionally, Venezuela wholly owned PDVSA. *Id.* at 148. Here, by contrast, the Republic owns a minority stake in Moldovagaz and has not exercised the level of control that Venezuela did in *Crystallex*.[15]

## B

Turning to *Bancec*'s second prong, Gater has failed to show that recognizing Moldovagaz's separate juridical status "would work fraud or injustice." *Bancec*, 462 U.S. at 629. It may be true, as the district court observed, that "[a]s a practical matter ... whatever corporate arrangements the Republic has with Moldovagaz, they have thus far worked to prevent Plaintiff from collecting its

---

[15] The district court's opinion in *Crystallex* further illustrates how PDSVA differs from Moldovagaz. The court explained that (1) Venezuela forced PDVSA to provide oil to China and Russia as repayment for loans those countries had made to Venezuela; (2) Venezuela used PDVSA's property, "including aircraft and tanker trucks, for its own political purposes"; (3) PDVSA identified Venezuela's extensive control as a risk factor in its bond offering documents; and (4) Venezuela appointed PDVSA's entire board. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 402 (D. Del. 2018). No comparable facts are present here.

judgment." *Gater II*, 413 F. Supp. 3d at 322. However, to meet *Bancec*'s fraud or injustice prong, Gater must do more than "merely to point out an injustice that would result from an adverse decision." *First Inv.*, 703 F.3d at 755. Rather, it must demonstrate that the Republic or Moldovagaz has "abused the corporate form" to "avoid[] their obligations." *EM Ltd.*, 800 F.3d at 95.

The facts on which the district court relied to pierce the veil between the Republic and Moldovagaz do not indicate an abuse of the corporate form. The district court emphasized that the Republic has at times provided funds to pay some of Moldovagaz's debts to Gazprom but not to other creditors. *See Gater II*, 413 F. Supp. 3d at 322-23. Yet Gater does not cite any authority establishing that preferring certain creditors qualifies as an abuse of the corporate from. In *EM Ltd.*, we held that there was "nothing irregular or fraudulent" about Argentina preferring the International Monetary Fund over other creditors because such a policy was necessary "to protect the funds of [the IMF's] member states." 800 F.3d at 93 n.70, 96. Here too there is nothing "irregular or fraudulent" about the Republic and Moldovagaz preferring Gazprom, which supplies Moldovans with an essential commodity, over other creditors.

The district court also pointed to Moldovagaz's "chronic undercapitalization" and to Moldovagaz's efforts to evade the ICAC's arbitral award judgment when it was originally issued. *Gater II*, 413 F. Supp. 3d at 322. But the record does not suggest that those circumstances involved a manipulation of Moldovagaz's corporate form. The district court cited no evidence that the Republic undercapitalized Moldovagaz for the purpose of evading its

31

creditors.[16] Rather, the evidence suggests that Moldovagaz's dire finances result from other circumstances. Almost 90 percent ($6.04 billion) of Moldovagaz's $6.76 billion debt stems from losses in the autonomous region of Transnistria. Customers there take gas from the supply lines that pass through that region and refuse to pay for it in full, and the Republic has no practical power to make them pay.[17] By contrast, a 2016 report on which Gater relies attributed under 3 percent ($140.5 million) of Moldovagaz's debts to the Republic's regulatory policies. There is no record basis to conclude, in light of Gazprom's majority stake, that the Republic could successfully undercapitalize Moldovagaz to avoid its creditors—the largest of which was Gazprom itself.

---

[16] The parties agree that according to relevant American corporate law, undercapitalization at the time of incorporation can be evidence of an abuse of the corporate form. *See* Response and Reply Brief for Respondent-Appellant-Cross-Appellee Moldovagaz 27-28 (citing 1 Fletcher § 41.33); *see also* Brief for Petitioner-Appellee-Cross-Appellant Gater Assets Limited 59 & n.11. If an entity is undercapitalized at that point, it "reveals ... the corporation was created to avoid liability." 1 Fletcher § 41.33. "Inadequate capitalization after incorporation" meanwhile, "is generally relevant if the capital was removed as part of a fraudulent conveyance scheme. In such a scheme, the inappropriate transfer of assets and not the level of capitalization would be the prevailing factor in determining whether to pierce the corporate veil." *NLRB v. Bolivar-Tees, Inc.*, 551 F.3d 722, 730 n.7 (8th Cir. 2008). Even assuming that debt accumulated post-incorporation could show abuse of the corporate form, *see* 1 Fletcher § 41.55 (noting that "[i]nsolvency" is a factor that may be "considered ... in deciding whether to pierce the corporate veil"), the debt in this case does not show such abuse.

[17] Some record evidence suggests that Gazprom is complicit in this state of affairs, providing gas to the separatist region of Transnistria in exchange for political fealty.

In a separate part of its opinion, the district court found that the Republic failed to adequately capitalize Moldovagaz at the time of its incorporation. *Gater II*, 413 F. Supp. 3d at 324. The record does not support that conclusion. Moldovagaz's constitutive contract indicates an initial capitalization of $290.5 million. The district court apparently disregarded the contract in part because it believed there was no "independent valuation" of those capital contributions. *Gater II*, 413 F. Supp. 3d at 324. But Moldovan law and Moldovagaz's charter both required an independent valuation. Moreover, Moldova's Commission on Financial Markets may not register a corporation's securities until it receives an independent report on the market value of the capital contributions, and the Commission did register Moldovagaz's shares. The district court therefore clearly erred in concluding that no independent valuation was completed simply because Moldovagaz could not produce a copy of a document—more than twenty years after Moldovagaz was created—that contained the initial valuation. *See Gater II*, 413 F. Supp. 3d at 324.

The district court also thought that a July 2000 decree from the Republic's Parliament showed that "the capital contributions had not been made in full" by that date. *Id.* But that decree does not indicate that there was a delay in contributing capital to Moldovagaz; it refers to a delay in Russia's recognition of Gazprom's new ownership stake and the debt reduction that should have resulted.[18] Gater attempts to

---

[18] *See* J. App'x 1820. ("[T]he Government shall[] turn to the Government of the Russian Federation with regard to the question of *accelerating the legal formalization* of the transfer to ... Gazprom on the account of repayment of the indebtedness of the Republic [of] Moldova[,] property in the amount of 93.3 million US dollars as the participatory share of participation in ... Moldova-Gaz S.A.") (internal quotation marks omitted) (emphasis added).

provide further support for the district court's conclusion that the Republic undercapitalized Moldovagaz at its inception, but the only additional evidence it identifies relates to the Republic's alleged undercapitalization of Gazsnabtranzit, not Moldovagaz.

This case does not resemble those circumstances that we have said justify piercing the veil between a sovereign and a related entity to avoid a fraud or injustice:

> [I]n *Bridas S.A.P.I.C.* [*v. Gov't of Turkmenistan*, 447 F.3d 411 (5th Cir. 2006)], the Fifth Circuit found "fraud or injustice" where Turkmenistan dissolved a state-owned oil company that was in breach of a joint venture with plaintiff, and replaced it with an under-capitalized state-owned oil company endowed with newly-enacted immunity protection [in order to escape liability]. And in ... *Kensington International Ltd. v. Republic of Congo*, [No. 03-CV-4578, 2007 WL 1032269 (S.D.N.Y. Mar. 30, 2007),] the Republic of Congo structured its relationship to its purportedly independent oil company by, *inter alia:* (1) designing the company's corporate structure to allow Congo to engage in "unnecessarily complex transactions and charades for the purpose of confounding its creditors"; (2) passing all proceeds from oil sales on to the government, rather than permitting the company to exercise its right to collect a percentage on transactions; and (3) commingling state and company assets. ...

> In *Bancec*, Cuba sought relief in a court of the United States while simultaneously trying to shield itself from liability by asserting its claim through its dissolved instrumentality.

*EM Ltd.*, 800 F.3d at 95 (footnotes omitted). And in *Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-*

*Exploracion Y Produccion*, we disregarded an entity's separate status when it tried to argue that it simultaneously was an independent corporation "for personal jurisdiction purposes" and should be "treated ... as [a] foreign sovereign" for "other issues in th[e] litigation." 832 F.3d 92, 103 (2d Cir. 2016). Unlike those cases, the evidence and litigation history here do not suggest that the Republic or Moldovagaz has been inconsistent or abusive with respect to Moldovagaz's corporate form. [19] The district court erred in concluding that Moldovagaz qualified as the Republic's alter ego under *Bancec*'s fraud or injustice prong.

In the end, the district court's conclusion that Moldovagaz is the Republic's alter ego seems to have been influenced by the fact that "Moldovagaz was created to pay down part of the Republic's debt to Gazprom and to provide for Moldova's citizens' energy needs." *Gater II*, 413 F. Supp. 3d at 325; *see also id.* at 317, 320. But a sovereign may form a separate entity to help it address problems such as these, and that entity retains its separate juridical status even if it "assist[s]" the sovereign in achieving the sovereign's "policies and goals." *EM Ltd.*, 800 F.3d at 94; *see also Seijas v. Republic of Argentina*, 502 F. App'x 19, 22 (2d Cir. 2012) (noting that an instrumentality's conduct taken "in accordance with [the sovereign's] policy preferences" and "as a vehicle for the government to obtain ... financial resources ... does not demonstrate that [the instrumentality] was an alter ego of [the sovereign]") (internal quotation marks and citation omitted). Such an entity loses its "presumption of independent status" only if the sovereign "so extensively control[s]" it "that a relationship of

---

[19] In contrast to the *Pemex* case, here Moldovagaz argues that it should not be treated like a foreign state for any purpose.

35

principal and agent is created" or if recognizing that separate status "would work fraud or injustice." *Bancec*, 462 U.S. at 627-29. Here, neither the Republic nor Moldovagaz has acted in a way that justifies denying Moldovagaz its status as a corporation juridically separate from the Republic.

## III

Our recognition of Moldovagaz's status as a corporate juridical entity separate from the Republic should dispose of the personal jurisdiction question in this case. Because we do not equate Moldovagaz with a foreign sovereign, due process requires that it have minimum contacts with the United States before an American court may exercise jurisdiction over it. Gater does not suggest that Moldovagaz has such contacts. Instead, Gater asks us to expand the exception we announced in *Frontera* and rule that agencies and instrumentalities of foreign sovereigns, as defined in the FSIA, are also not "persons" entitled to due process protections, even if those agencies and instrumentalities do not qualify as the sovereign's alter ego.[20]

---

[20] We left this question open in *Frontera*. *See* 582 F.3d at 401 (noting that "it would be premature for us to address" whether "a corporation owned by a foreign state but not the state's agent [under *Bancec*] was entitled to the Due Process Clause's protections"). In *Pemex*, we quoted *Frontera* in stating that "[t]he jurisdictional protections of the Due Process Clause do not apply to 'foreign states and their instrumentalities.'" 832 F.3d at 102 (quoting *Frontera*, 582 F.3d at 399). The *Pemex* court proceeded to state that "[t]he same conclusion does not follow for foreign corporations ... which are persons at law." *Id.* at 103. It then analyzed the case before it the same way that the *Frontera* court did, using the *Bancec* framework. *Id.* ("The line between a foreign sovereign and a foreign corporation ... is informed by [*Bancec*]."). The language that *Pemex* quoted from *Frontera* regarding

We decline to do so. Foreign corporations are plainly persons entitled to the personal jurisdiction protections that litigants receive as a matter of due process. *See Pemex*, 832 F.3d at 103 ("The jurisdictional protections of the Due Process Clause ... apply to ... foreign corporations. ... [D]ue process rights can only be exercised by persons, including corporations, which are persons at law.") (internal citations omitted); *see also Goodyear Dunlop Tires*, 564 U.S. at 918-20; *Daimler*, 571 U.S. at 120-22. This remains true regardless of which Due Process Clause applies. *See Waldman*, 835 F.3d at 330 ("This Court's precedents clearly establish the congruence of due process analysis under both the Fourteenth and Fifth Amendments."). Our conclusion that Moldovagaz is not an alter ego of the Republic necessarily implies that we recognize its status as a foreign corporation. It may be a foreign corporation that serves as an agency or instrumentality of a foreign sovereign—as the FSIA defines that term—but Gater offers no compelling reason to conclude that while the Fifth Amendment's use of the word "person" generally includes corporations, it excludes those corporations that have a close relationship with a foreign sovereign.[21] Nor does it cite authority to establish that a corporation's

---

"foreign states and their instrumentalities," *id.* at 102, therefore, is properly understood as referring to instrumentalities that are alter egos under the *Bancec* test, not to all entities that may be considered agencies or instrumentalities under the FSIA. In quoting and relying on *Frontera*, the court in *Pemex* did not purport to resolve the question that *Frontera* left open.

[21] Congress, meanwhile, has expressed its view that corporations qualifying as agencies or instrumentalities under the FSIA are persons. By definition, an "agency or instrumentality of a foreign state" must be "a separate legal *person*, corporate or otherwise." 28 U.S.C. § 1603(b)(1) (emphasis added).

juridical personhood is dependent on the identities of its shareholders.[22]

We therefore join two of our sister circuits in holding that foreign corporations that do not meet *Bancec*'s veil-piercing standards "enjoy all the due process protections" regularly afforded to litigants challenging personal jurisdiction. *GSS Grp.*, 680 F.3d at 815; *see also First Inv.*, 703 F.3d at 752-55. This remains true regardless of whether the corporation qualifies as an agency or instrumentality of a foreign state under the FSIA. Because Moldovagaz is not the Republic's alter ego under *Bancec*, "United States courts may not exercise personal jurisdiction over [Moldovagaz] unless [it] has 'minimum contacts' with the relevant forum." *GSS Grp.*, 680 F.3d at 817. It is undisputed that Moldovagaz "has no contacts with the United States apart from this litigation." *Gater I*, 2018 U.S. Dist. LEXIS 171350, at *56 n.8 (quoting Gater's brief before the district court). Therefore, the district court lacked personal jurisdiction over Moldovagaz for Gater's renewal action.[23]

---

[22] The FSIA's definition of an "agency or instrumentality of a foreign state" includes, with narrow exceptions, all corporations "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof," regardless of the corporation's activities. 28 U.S.C. § 1603(b). We doubt that the reach of the Due Process Clauses depends on whether only private as opposed to public entities hold ownership interests in a corporation otherwise entitled to protection. *Cf. Lochner v. New York*, 198 U.S. 45, 75 (1905) (Holmes, J., dissenting) ("The 14th Amendment does not enact Mr. Herbert Spencer's Social Statics.").

[23] Recent scholarship suggests that we err in viewing due process as an independent constraint on a court's exercise of personal jurisdiction. *See* Stephen E. Sachs, *Pennoyer Was Right*, 95 Tex. L. Rev. 1249, 1323 (2017) ("[D]ue process requires jurisdiction, full stop, with the actual jurisdictional

## IV

Having concluded that the district court lacked personal jurisdiction over Moldovagaz, we turn to Gater's renewal claim against the Republic. As a foreign sovereign, the Republic may not protest that allowing this suit to proceed against it would violate due process limits on personal jurisdiction. *See Frontera*, 582 F.3d at 399.[24] Instead, the Republic argues that the district court lacked subject-matter jurisdiction over Gater's claim against it. We agree.

---

standards supplied by other sources of law."). In the United States, a forum's legislature always had ultimate authority to determine when its courts should exercise the judicial power. *Id.* at 1284-87; *see also Picquet v. Swan*, 19 F. Cas. 609, 615 (Story, Circuit Justice, C.C.D. Mass. 1828). Here, Congress has expressly provided for personal jurisdiction so long as a foreign state is served pursuant to the FSIA's requirements. *See* 28 U.S.C. § 1330(b). Moldovagaz does not argue that it was not properly served. Therefore, under this view, if Moldovagaz is a foreign state under the FSIA—a category that includes a sovereign's agencies and instrumentalities, *see* 28 U.S.C. § 1603(a))—then the district court would have had personal jurisdiction regardless of minimum contacts or an alter ego analysis. *See* Ingrid Wuerth, *The Due Process and Other Constitutional Rights of Foreign Nations*, 88 Fordham L. Rev. 633, 681-86 (2019). However compelling this view might be, it conflicts with controlling precedent. *See Waldman*, 835 F.3d at 329-31.

[24] Recent scholarship questions our earlier holding in *Frontera* that foreign sovereigns do not qualify as persons under the Due Process Clause. *See* Brief of Amicus Curiae Professor Ingrid Brunk Wuerth in Support of Neither Party 6-13 (detailing evidence that, at the time of the founding, foreign sovereigns were considered "persons" entitled to "process"). Yet we remain bound by *Frontera* here. *See In re Sokolowski*, 205 F.3d 532, 534-35 (2d Cir. 2000) ("[T]his court is bound by a decision of a prior panel unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court or this court *en banc*.").

"The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Barnet v. Ministry of Culture & Sports of the Hellenic Republic*, 961 F.3d 193, 199 (2d Cir. 2020). Because the FSIA directs that a "foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607," sovereign immunity from suit "is the default rule, subject only to specific exceptions." *Id.*

The district court held that Gater's claim against the Republic fits into section 1605's exception for actions "to confirm an award made pursuant" to a qualifying "agreement to arbitrate" that was "made by the foreign state." 28 U.S.C. § 1605(a)(6); *see Gater II*, 413 F. Supp. 3d at 325-28. For that immunity exception to apply here, the relevant arbitration agreement must have been "made by" the Republic. 28 U.S.C. § 1605(a)(6). All parties agree that the qualifying "agreement to arbitrate" in this case is a 1996 contract entered into by Gazprom and Moldovagaz's predecessor, Gazsnabtranzit. The award Gater seeks to collect resulted from an arbitration that occurred pursuant to the arbitration clause in that contract.

It is undisputed that the Republic never signed that contract, and nowhere does the contract indicate that the Republic was a party to it.[25] Nevertheless, the district court concluded that the contract was "made by" the Republic because the Republic could be bound to the

---

[25] In one clause, the contract stipulates that "Moldova will produce a timetable for paying off" certain debts. J. App'x 32. But the clause notes that this obligation "result[s]" from "the inspection of [certain] joint settlements," implying that it does not derive from the contract itself. J. App'x 32. In addition, a section of the contract titled "Responsibilities and Obligations of the Parties" does not assign any obligations to the Republic. J. App'x 32-33.

contract's arbitration clause under a "direct benefit[s] estoppel theory"—a theory under which courts may "bind[] nonsignatories to arbitration agreements." *Gater II*, 413 F. Supp. 3d at 325-27 (citing *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995)).[26] The district court found that the Republic directly benefited from the Gazsnabtranzit-Gazprom agreement because the Republic discharged a preexisting treaty obligation to Russia by causing Gazsnabtranzit to enter into the contract. *Id.* at 326. The district court concluded that a direct benefits estoppel theory may apply so long as a party accepts any benefit that flows from a contract's formation, even if that benefit does not derive from any terms in the contract itself. *See id.* at 327.

We have suggested in dicta that direct benefits estoppel can apply not only to bind a private party to an arbitration agreement but also to abrogate a state's immunity under the FSIA's arbitration

---

[26] In addition to finding subject-matter jurisdiction on this alternative basis, the district court concluded that Moldovagaz, as Gazsnabtranzit's successor-in-interest, assumed Gazsnabtranzit's obligations under the contract. *Gater Assets*, 2018 U.S. Dist. LEXIS 171350, at *53-56. The district court then relied on its determination that Moldovagaz is the Republic's alter ego to hold that the Republic "made" the contract. *Gater II*, 413 F. Supp. 3d at 326. Because we conclude that Moldovagaz is not the Republic's alter ego, this reasoning can no longer support subject-matter jurisdiction over Gater's claim against the Republic. If Gazsnabtranzit itself were the Republic's alter ego, that might support the application of the FSIA's arbitration exception here. *See Thomson-CSF*, 64 F.3d at 777. The district court, however, did not make any conclusions regarding Gazsnabtranzit's possible alter ego status and Gater does not pursue this theory on appeal. Accordingly, we deem this argument waived. *See Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006).

immunity exception.[27] Yet the applicability of this equitable doctrine to the FSIA is far from clear. When Congress codified the arbitration immunity exception, it specified that the exception applied only in the presence of an agreement "made by the foreign state." 28 U.S.C. § 1605(a)(6). A contract can be said to be "made by" only the parties to it.[28] While we have said that courts should use their "equitable" powers to "estop[]" a party "from denying its obligation to arbitrate when it receives a direct benefit from a contract containing an arbitration clause," *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999), that does not necessarily mean that parties in such a position "made" the underlying contract. Nevertheless, we need not conclusively decide whether direct

---

[27] In *Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, we affirmed the district court's *forum non conveniens* dismissal of a petition to enforce an arbitration award against Naftogaz and Ukraine. 311 F.3d 488, 501 (2d Cir. 2002). Because we affirmed on *forum non conveniens* grounds, we declined to "address the [petitioner's] substantive contentions" that an arbitration agreement that bound Naftogaz could abrogate Ukraine's immunity under the FSIA because Naftogaz was either Ukraine's agent or alter ago. *Id.* at 494-95. In bypassing that argument, we included "estoppel" on a list of "theories under which a non-signatory party may be bound by an arbitration agreement and thus subject to the jurisdiction of the court in proceedings to compel arbitration or confirm an arbitration award." *Id.* at 495.

[28] In fact, Congress added the arbitration exception "to implement the Inter-American Convention on International Commercial Arbitration." Pub. L. No. 100-669, 102 Stat. 3969 (1988). That convention, in turn, speaks of "parties" who have "undertake[n] to submit to arbitral decision any differences that may arise or have arisen between them" in an "agreement ... set forth in an instrument signed by the parties, or in the form of an exchange of letters, telegrams, or telex communications." Inter-American Convention on International Commercial Arbitration, art. 1, *done* Jan. 30, 1975, T.I.A.S. 90-1027, 1438 U.N.T.S. 245.

benefits estoppel can abrogate a foreign state's immunity under the FSIA.[29] Even assuming that direct benefits estoppel can apply here, Gater cannot avail itself of such a theory.

To be bound under a theory of direct benefits estoppel, "[t]he nonsignatory beneficiary must actually invoke the contract to obtain

---

[29] The Supreme Court's recent decision in *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637 (2020), does not compel the conclusion that direct benefits estoppel applies to the FSIA. In a case involving private parties, the Court reiterated that the Federal Arbitration Act "permits courts to apply state-law doctrines related to the enforcement of arbitration agreements," including "equitable estoppel." *Id.* at 1643-44. The Court then held that the New York Convention, to which the Federal Arbitration Act's rules apply absent a conflict, "does not conflict" with "the equitable estoppel doctrines permitted under" the Federal Arbitration Act. *Id.* at 1644-45, 1648. That the Federal Arbitration Act and the New York Convention permit the application of estoppel doctrines does not suggest that such doctrines establish that a foreign state "made" an arbitration agreement and must answer claims based on that agreement in an American court. 28 U.S.C. § 1605(a)(6). Unlike the arbitration context generally, there is no "strong and 'liberal federal policy favoring arbitration agreements'" that would subject foreign states to the jurisdiction of American courts. *Thomson-CSF*, 64 F.3d at 776 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985)). Moreover, the application of the estoppel doctrine in *GE Energy* "allow[ed] a *nonsignatory* to a written agreement containing an arbitration clause to compel arbitration where a *signatory* to the written agreement must rely on the terms of that agreement in asserting its claims against the nonsignatory." 140 S. Ct. at 1644 (emphasis added). Here, by contrast, a signatory's assignee (Gater) seeks to use the arbitration agreement against a nonsignatory (the Republic) not only to collect an arbitral award but also—through an equitable theory—to abrogate its immunity under the FSIA and to require it to answer in an American court. *GE Energy* did not consider, much less compel, the extension of direct benefits estoppel to confer jurisdiction in a case like the one before us.

43

its benefit, or the contract must expressly provide the beneficiary with a benefit." *Trina Solar*, 954 F.3d at 572; *see also MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 62 (2d Cir. 2001) (holding this theory applies only when a nonsignatory "knowingly exploited [a] purchase contract and thereby received a direct benefit from the contract") (alterations and internal quotation marks omitted). As district courts in this circuit have recognized, "the mere fact of a nonsignatory's affiliation with a signatory will not suffice to estop the nonsignatory from avoiding arbitration, no matter how close the affiliation is." *Life Techs. Corp. v. AB Sciex Pte. Ltd.*, 803 F. Supp. 2d 270, 274 (S.D.N.Y. 2011). Examples of direct benefits serving as the basis for estoppel have included, for example, (1) the right of a foreign affiliate to use the "Deloitte" trade name, arising from an agreement resolving an intellectual property dispute to which that particular affiliate was not a signatory but which expressly conferred the trade name right on the affiliate, *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1062, 1064 (2d Cir. 1993); and (2) the right of a vessel owner, which had commissioned a custom racing sailboat, to take advantage of lower maritime insurance rates and to register a vessel under a particular flag, *Tencara Shipyard*, 170 F.3d at 353.

As the district court acknowledged, the Gazsnabtranzit-Gazprom agreement gave the Republic no rights to purchase or receive gas. Rather, Gater argued—and the district court found—that the Republic derived direct and substantial benefits from the Gazsnabtranzit-Gazprom agreement by "discharging [the Republic's] obligations" under an earlier 1996-97 Moldova-Russia trade agreement. *Gater II*, 413 F. Supp. 3d at 326.

44

The record does not support the conclusion that this alleged benefit binds the Republic to arbitration under a direct benefits estoppel theory. The Gazsnabtranzit-Gazprom agreement did not "expressly provide the [Republic] with a benefit" with respect to the trade agreement. *Trina Solar*, 954 F.3d at 572. Moreover, the trade agreement required only that the Republic "instruct" the relevant state bodies "to prepare proposals" for the inter-country shipment of specified quantities of over fifty products, including natural gas. J. App'x 1104, 1107-10. The specific purchase terms and even the consummation of the Gazsnabtranzit-Gazprom agreement were not necessary for the Republic to discharge its obligations under the trade agreement. By contrast, our cases have estopped nonsignatories only when the agreement itself confers a "tangible and definite" benefit. *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 39-40 (2d Cir. 2002) (discussing *Deloitte*, 9 F.3d 1060, and *Tencara Shipyard*, 170 F.3d 349).

Additionally, the record here does not indicate that the Republic "actually invoke[d]" the Gazsnabtranzit-Gazprom agreement to obtain any benefit the agreement might have provided with respect to the discharge of the Republic's obligations to Russia under the trade agreement. *Trina Solar*, 954 F.3d at 572-73 (rejecting direct benefits estoppel because, although a nonsignatory "surely benefited" from the contract by receiving solar panels, "no record evidence" indicated that the nonsignatory "invoked the Contract to demand delivery of the solar panels" or "invoke[d]" a signatory's "duties" in order to "seek or obtain" any benefits at all). Absent evidence of a direct and definite benefit, Gazsnabtranzit's and Gazprom's agreement to arbitrate disputes over gas supplied to the

45

Republic in 1997 does not estop the Republic from claiming immunity here.[30]

In sum, the Republic was not a party to the Gazsnabtranzit-Gazprom agreement, and that agreement does not bind the Republic to arbitration or abrogate its immunity under 28 U.S.C. § 1605(a)(6).[31] The district court, therefore, lacked subject-matter jurisdiction over Gater's renewal claim against the Republic.

## V

While we have concluded that the district court lacked jurisdiction over both parties for the renewal action, we must now consider whether the district court erred by denying the motions to vacate the original default judgment under Rule 60(b)(4).[32] It did not. A party appealing the denial of a Rule 60(b)(4) motion must carry a heavy burden to merit vacatur of the original judgment. It must show

---

[30] The district court itself recognized "concern about [its] broader reading of direct benefit estoppel theory" but considered that concern "mitigate[d]" by "the unique alter ego relationship between the Republic and Moldovagaz." *Gater Assets*, 413 F. Supp. 3d at 328. As we have held, however, the record does not support the conclusion that Moldovagaz is an alter ego of the Republic.

[31] If the Republic—rather than Moldovagaz—had assumed Gazsnabtranzit's obligations under the contract, that might establish that the Republic "made" the agreement and must answer to Gater's claims premised on it because, as a legal matter, the Republic would have stepped into Gazsnabtranzit's shoes. *See Thomson-CSF*, 64 F.3d at 777. Yet Gater does not establish that the Republic assumed these obligations.

[32] Only the Republic specifically requests that we vacate the original default judgment, but Moldovagaz adopted the Republic's arguments pursuant to Federal Rule of Appellate Procedure 28(i) to the extent that those arguments are applicable to Moldovagaz.

that the district court in that original action "plainly usurped jurisdiction" such that there was "a total want of jurisdiction and no arguable basis on which [the district court] could have rested a finding that it had jurisdiction." *Herbert*, 341 F.3d at 190.

To determine whether the district court had jurisdiction to issue the default judgment, we would need to analyze the relationship between Moldovagaz and the Republic when Lloyd's filed the original action to confirm its arbitral award in December 1999. But the arguments in this appeal focus on the Moldovagaz-Republic relationship at the time of Gater's renewal action and rely heavily on facts that postdate the default judgment. We therefore conclude that neither the Republic nor Moldovagaz has satisfied its burden to show that vacatur is warranted.

## CONCLUSION

For the foregoing reasons, the district court lacked jurisdiction over Gater's renewal action. Accordingly, we **VACATE** the district court's judgment in the renewal action and **REMAND** with instructions to dismiss the renewal action for lack of jurisdiction. Nevertheless, because Moldovagaz and the Republic failed to demonstrate that the district court lacked an arguable basis to exercise jurisdiction over the original action, we **AFFIRM** the district court's denial of the Rule 60(b)(4) motions.